[Civ. No. 18761. Fourth Dist., Div. One. Nov. 30, 1981.]

HELEN K. COPLEY, Individually and as Co-trustee, etc., et al., Plaintiffs, Cross-defendants and Appellants, v.
MICHAEL COPLEY et al., Defendants, Cross-complainants and Appellants.

[Civ. No. 22214. Fourth Dist., Div. One. Nov. 30, 1981.]

DAVID C. COPLEY et al., Plaintiffs and Appellants, v.
MICHAEL COPLEY et al., Defendants and Respondents.

COUNSEL

Roger G. Steiner, Luce, Forward, Hamilton & Scripps, William T. Fitzgerald, Laurence L. Pillsbury and McInnis, Fitzgerald, Rees, Sharkey & McIntyre for Plaintiffs, Cross-defendants and Appellants.

Leslie E. Osborne, Jr., and Harrigan, Ruff & Osborne for Plaintiffs and Appellants.

Hervey & Horton, James Edgar Hervey, Jacklyn Becker Horton, Parker, Milliken, Clark & O'Hara, and Frank W. Clark, Jr., for Defendants, Cross-complainants and Appellants and for Defendants and Respondents.

OPINION

**COLOGNE, J.—**

### THE SYLLABUS

Here is the perplexing dilemma facing the trustees of an *inter vivos* trust when they are given broad powers but must exercise them in an

atmosphere heavily laden with conflicting interests. The trustees are given voting control of substantially all the stock of Copley Press, Inc., a large newspaper which had been operated by the trustor as a one-man business. Helen Copley, widow of the trustor and co-trustee, is given broad powers of discretion and by the lead of her husband and counsel elected to continue the business as a family enterprise. The *inter vivos* trust, with the usual marital and nonmarital trust features, burdened the nonmarital trust with the obligation to pay all death taxes and administration expenses. It was required to sell certain of the stock to raise these funds. Opting for a stock redemption plan under the provisions of Internal Revenue Code section 303, 19 months after the trustor's death, the trustees were able to achieve a tax-free sale to the Copley Press of enough stock to pay the death taxes on an installment plan. About a year and a half later, the redemption price was set at $35, which was the same value the Internal Revenue Service determined after extensive negotiations was the value at the date of death. Since that sales price would be the basis of the stock for income taxes, there would be no income tax assessed on the sale. After the stock sale but before the valuation was set, the trustees petitioned the court for approval of their acts. The children of the trustor by his first wife, two of the four beneficiaries under the nonmarital trust, complain the trustees should have sold the stock at a higher price per share and, if they had tried to sell to third persons, they would have known that the basis used for the redemption agreement was grossly below fair market value.

Underlying all these transactions is the trustees' effort to keep death taxes low and avoid heavy income tax burdens on the trust. The trial court found the trustees committed no fraud; under Helen Copley's management, Copley Press prospered and the value of the stock improved markedly; the accounting of the trustees was correct in every detail except the stock value and litigation fees. It found the stock redemption price was in fact low and should have been effected at $58 per share rather than the $35 figure. The trial court adjusted the stock holdings and dividends to reflect what the respective holdings of the marital and nonmarital trust would have been had the sale been effected at the proper figure. We approve this part of the superior court's order.

The court also held, however, while Helen Copley committed no fraud nor violated the provisions of the trust agreement, the trustees performed their functions facing known conflicting interests and were guilty of a breach of their fiduciary duty to the beneficiaries of the non-

marital trust and should be replaced by a corporate trustee. We hold this portion of the judgment unsupported. The positions with obvious conflicting interests were created by the trustor and intended by him to serve the interests of all the beneficiaries. Helen Copley's actions as administratrix with the will annexed, trustee, beneficiary and Copley Press' principal officer were directed toward the best interests of the beneficiaries and in accordance with the intent of the trustor. The beneficiaries have not been prejudiced. The trustees' acts were reasonable in light of the duties imposed under the terms of the trust and did not justify their discharge. We reverse that portion of the order removing them as trustees.

We adjust the trial court's award of attorneys' fees to conform to the result of this opinion.

## PROCEDURAL BACKGROUND

Helen K. Copley and Joseph P. Kinney, individually and as co-trustees of two trusts (designated the marital trust and the nonmarital trust) created by the late James S. Copley,[1] brought the original action (super. ct. No. 381314) in declaratory relief to determine the propriety of their action as trustees in selling certain of the nonmarital trust's shares of stock of The Copley Press, Inc. to the corporation.[2] They also sought substantially the same relief in a separate proceeding under Probate Code section 1138.1 (super. ct. No. 111584 consolidated with 115984). Michael Copley and Janice Copley, beneficiaries under the nonmarital trust, moved to dismiss the probate petition. The motion was denied, and on appeal to this court we reversed the order with directions to consolidate the Probate Code section 1138.1 proceeding with the declaratory relief action and cross-actions and to try the latter action first (*Copley* v. *Copley* (1978) 80 Cal.App.3d 97, 109-110 [145 Cal.Rptr. 437]).

Michael Copley and Janice Copley (objectors) filed objections to the petitions and cross-complained asserting, among other contentions, the stock was sold for a price below the market value 19 months after James Copley's death and this was a breach of the trustees' fiduciary

---

[1]Estate of Copley is now being probated in the Superior Court of San Diego County as probate case No. 104636.

[2]The Copley Press, Inc. is an Illinois corporation and all references to "Copley Press" or the "corporation" relate to this entity. All "stock" referred to is stock of this corporation.

duties. They sought a rescission of this sales agreement[3] or, in the alternative, payment of the higher price to the nonmarital trust, as well as an accounting and surcharge against the trustees, imposition of a constructive trust, removal of the trustees, receivership, injunctive relief, attorneys' fees and general and punitive damages.

Among other things, the trial court found the trustees were guilty of no actual fraud, but committed a constructive fraud on the beneficiaries of the nonmarital trust. It ordered the trustees to transfer certain stock and pay certain sums from the marital trust as a means of restoring the parties to the position they would have held had the sale been properly consummated. The court also ordered the removal of Helen K. Copley and Joseph P. Kinney as trustees of the nonmarital trust and appointed Bank of America National Trust and Savings Association as trustee of the nonmarital trust, ordering all assets delivered to the bank with a proper accounting. The court ordered the nonmarital trust to pay the attorneys for the objectors for services rendered in prosecuting this case together with sums for extraordinary costs. It ordered the accountings approved as rendered except in certain respects which were detailed in the judgment and, among other things, disallowed attorneys' fees and other compensation from the nonmarital trust for the co-trustees in pursuing this action. It also ordered the assets be redefined as amended by this judgment. Finally, in order to protect the rights of all beneficiaries of the nonmarital trust, the court ordered the new trustee to notify all beneficiaries of any intention to sell the shares of the corporation held in the nonmarital trust.

Following the rendition of judgment in this matter, David C. Copley and John L. Satterlee, potential beneficiaries of the remainder under the trusts, filed a notice of motion to vacate judgment pursuant to Code of Civil Procedure sections 473 and 663. They also filed an objection to the hearing of this matter by Judge Todd pursuant to Code of Civil Procedure section 170.6. Judge Todd refused to disqualify himself and found the court was without jurisdiction to rule on the motion to vacate the judgment. David Copley and John Satterlee appeal these orders of the court.

---

[3]The words "sale" and "redemption" in this opinion are used interchangeably and not intended to have any specific meaning for tax purposes. Tax issues are outside the ambit of resolution in this appeal, though we recognize an ultimate effect of our opinion may well include tax consequences. Due to uncertainties attending any particular result and the fact counsel admittedly are not tax experts, the court is not advised except in a generalized, contextual way about specific tax consequences.

The matters were consolidated for purposes of this appeal.

The trustees contend the stock redemption agreement was fully proper, representing the exercise of sound judgment accorded them under the authority of the trust instrument and serving the best interests of the nonmarital trust. The trustees contend further the trial court substituted its judgment for the terms of the trust instrument which committed trust property transfer decisions to the sole discretion of the trustees and thus the court ignored James Copley's intent. They also contend the trial court erred in refusing to consider evidence of James Copley's intent, denying the trustees' request for findings on specific issues, failing to require the joinder of indispensable parties and granting remedies, all providing additional grounds for reversal of the judgment.

## THE PERSONS INVOLVED

Helen Copley is the surviving spouse of James Copley who died October 6, 1973, and after that date she was a named co-trustee of the *inter vivos* trust executed by James Copley in 1959 and amended from time to time. She was appointed administratrix with-the-will-annexed of James Copley's probate estate on the resignation of Thomas C. Ackerman, Jr., who briefly served as the executor named in James Copley's will. Following the death of James Copley, she became the chief executive officer and chairperson of the board of directors of the corporation. Helen Copley is the sole income beneficiary of the marital trust over the corpus of which she has a general power of appointment, and is one of the four permissible distributees of the income of the nonmarital trust.

Joseph P. Kinney is the brother of Helen Copley and has no beneficial interest in either trust. Joseph Kinney succeeded to the co-trustee position when Thomas C. Ackerman, Jr., resigned.

Michael Copley and Janice Copley are the adopted children of James Copley by his first marriage and two of the permissible distributees of the income from the nonmarital trust. They are defendants in the declaratory relief action, objectors to the petitions and cross-complainants below.[4]

---

[4]Michael Copley and Janice Copley filed cross-appeals in this action for the sole purpose of preserving jurisdiction over all parties to the litigation. Since they have filed no cross-appellants' briefs, the cross-appeal is to be dismissed.

David Copley is the natural son of Helen Copley and the adopted son of James Copley. He is also one of the permissible distributees of the income from the nonmarital trust and the primary remaindermen of that trust. He was not a party to this action during any of the prejudgment proceedings.

John L. Satterlee is the brother of James Copley and one of the contingent remaindermen of the nonmarital trust. He joined David Copley in the motion to vacate the judgment in this matter.

Thomas Ackerman was James Copley's attorney and was designated executor of James Copley's estate and original surviving co-trustee in the *inter vivos* trust. He resigned both positions on December 6, 1973.

The Copley Press, Inc. is a publishing business owning six newspapers and attendant facilities. James Copley succeeded to the controlling shares of the corporation primarily from his father's estate. James Copley controlled the corporation as sole trustee and income beneficiary of his *inter vivos* trust which held virtually all the shares of the corporation.

## The Facts

James Copley created a revocable *inter vivos* trust in 1959. The trust was amended from time to time and, on May 24, 1973, with knowledge he was terminally ill, James Copley executed a final amendment to this trust which is the subject of these proceedings. At the time of execution of this amendment, Mr. Copley also executed a last codicil to his will designating the *inter vivos* trust as the residuary beneficiary of his estate. At his death, James Copley was sole trustee, and the trust agreement provides that after his death, when the trust becomes irrevocable, there are to be two individual successor trustees at all times. It names Helen Copley and Thomas Ackerman as the successor co-trustees. They are given power to designate their successors and on the same date the trust agreement was last amended, May 24, 1973, they designated Joseph P. Kinney to serve as successor individual trustee if either Helen Copley or Thomas Ackerman became unwilling, unable or ceased to serve as original successor individual trustee. Differences between the two developed and Ackerman resigned as co-trustee. Joseph Kinney then filled in as his designated replacement co-trustee.

At the time of James Copley's death, the *inter vivos* trust was fully funded. Its corpus consisted of 1,725,000 shares of the corporation's common stock which represented all of the outstanding common stock shares, and 8,501.25 shares of Copley Press preferred stock which represented 17.59 percent of the outstanding preferred stock of the corporation. The remaining preferred stock was held by a retirement fund and various charities. All stock, common and preferred, was voting stock.

Pursuant to the terms of the trust agreement, on James Copley's death the corpus of the *inter vivos* trust was equally divided between two separate trusts, a marital deduction trust and a nonmarital trust, so that each of the trusts held 862,500 shares of common stock and 4,250.625 shares of the preferred stock. Each trust originally held a voting interest in the corporation of 48.877 percent, the remaining voting interest being in the retirement fund and charities. The nonmarital trust was also the named residual beneficiary of the Copley probate estate. The assets which poured over from the probate estate consisted of a significant but very small part of Copley's total wealth.

Helen Copley was the sole income beneficiary of the marital trust and had a general power of appointment over its corpus. In the event there was a failure of disposition of any portion of the marital trust by Helen Copley, then on her death the corpus of the trust, including the income then accrued and undistributed, is to be added to the nonmarital trust and administered as a part of that trust.

The nomarital trust is to be administered as a separate trust, the income to be divided among (1) Janice Copley, (2) Michael Copley, (3) David Copley, and (4) Helen Copley herself. Subject to a superior obligation to pay a fixed sum annually to James Copley's former spouse pursuant to a property settlement agreement, the trustees were given sole and absolute discretion in the distribution of all the income annually among the four beneficiaries as the trustees may deem appropriate and to the best interests of the beneficiaries. However, Helen Copley was not allowed to participate in any such decision. The sole benefit of Janice Copley and Michael Copley expressed in the trust is the right to income for their respective lives.[5] On Helen Copley's demise, the nonmarital trust is to be divided into three equal shares with the entire

---

[5]The trust instrument also invests the trustees with uncontrolled discretion, if they deem it appropriate, to invade principal and apply it to the use and benefit of any beneficiary with respect to whom the trustees in their judgment determine the trust income together with other known resources is insufficient to provide for that beneficiary's

income from each share to be paid annually to each of the children. When Janice Copley and Michael Copley, respectively, die and are survived by David Copley or his issue, the share held in trust for the deceased child is added to David Copley's share and either held in trust for him (or his issue) or distributed outright to him (or his issue) according to his age. Thus, by the trust's terms, the entire corpus of the nonmarital trust eventually is to pass to David Copley, after Helen Copley's death, in increments according to his age (or if he is deceased, to his issue), provided he (or his issue) survives Helen, Janice and Michael. John Satterlee or his issue, and certain named charities have a contingent remainder interest.[6]

The nonmarital trust is burdened with two obligations: (1) to pay all death taxes due the federal and state governments as a result of James Copley's demise, as well as all debts and expenses of administration of his estate, and (2) to pay James Copley's first wife, Jean Erdman, $100,000 per year for the remainder of her life. The payment to Ms. Erdman is to be made from the income of the nonmarital trust before any other income is distributed to the discretionary income beneficiaries and if the income is inadequate, the payment to her shall be made from the principal.

The trust agreement gives the trustees power to vote in person or by proxy any shares held by the trust.

There is no provision in the trust requiring the trustees to retain ownership in the corporation or mandating the stock of the corporation be closely held within the family. The trust, however, authorizes the trustees, in their sole discretion, to retain for any length of time and under any circumstances any securities or other property received from James Copley, his estate or any trust he established, among other sources mentioned, "whether or not such securities or other property are of a type or quality or constitute a diversification considered proper for trust investments and the trustees shall not be liable for any such retention."

suitable care, support, maintenance, education, medical attention and general welfare. (Trust Art. VII.) Thus, Janice and Michael Copley's "income" interests include, by the trust's terms, a possibility of reaching principal, at the trustees' discretion, for life purposes.

[6]In their briefs, Janice Copley, and Michael Copley claim to have a reversion in the trust's corpus based upon the contingency of David Copley dying without issue before they die. In that event, they contend the trust makes no distribution provision and, to the extent of the particular share involved, either Janice or Michael or both may well have a claim through intestate succession. The existence of such a reversion is not essential to the resolution of the issues here and we purposely make no effort to resolve it.

(Trust Art. XII, par. 3.) Other trust provisions authorize acquisition of property from the executor, administrator or testamentary trustee of James Copley's estate, "although the acquisition of such property may result in a large percentage of the trust estate of any trust hereunder being invested in one class of property." (Art. XII, par. 3.) The trust specifically mentions Copley Press stock and securities as assets which may be retained for as long as the trustees deem advisable. Further, to fulfill James Copley's desire, so far as is practical, to assure Janice and Michael will receive substantial income from their shares of the trust, and reciting awareness the common stock of The Copley Press, Inc. may not meet this goal, the trust authorizes the trustees, if on Helen Copley's death a major portion of the trust estate consists of stock in that corporation, to allocate such stock to the extent possible to the share of David Copley and other assets to the shares of Janice and Michael, or to recapitalize Copley Press to create a class of stock with reasonable preference as to dividends for allocation to the shares for Janice and Michael.

In this connection, the trust also provides: "The Trustees are expressly authorized to take or not take any such action in their sole and absolute discretion, provided the fair value of the assets allocated to each share is equal. The decision of the Trustees as to any action of the type described in this paragraph, and as to fixing of the value of assets for purposes of allocation, shall be conclusive and binding on all parties interested in the trust." (Trust Art. V, par. (a).)

The trust instrument gives the trustees broad powers, stating: "The Trustees are hereby authorized and empowered from time to time to sell at public or private sale, assign, pledge, mortgage, exchange, contract with respect to [sic] option, lease ... protect, partition, dispose of [sic] transfer, or deliver any and all property, real and personal, held by them in any trust hereunder, upon such terms as the trustees, in their sole discretion, may deem advisable for the best interests of said trust." (Trust Art. XII, par. 3.)

In imposing upon the trustees the duty to pay all death and other taxes on account of the trust if the residue of James Copley's estate does not pay these sums, and to pay all his debts and administrative expenses as well as taxes to the extent funds are not available in his estate or cannot be obtained by his estate without sacrifice, the trust confers on the trustees "complete discretion in determining the amount of such taxes, debts and expenses payable by the trusts hereunder, and the

Trustees shall be fully protected in paying out of such trusts any such sums for said purposes as shall be requested in writing by such Executors or Administrators." (Art. XII, par. 13.)

On this subject, the trust provides, in addition: "The Trustees shall, upon written request of the Executors or Administrators, advance to or reimburse the Executors or Administrators for such sums or any portion thereof, except that the Trustees may, in their discretion, pay any portion or all of any taxes direct to the taxing authority. All such sums shall be charged against and paid from the various trusts provided for herein in proportion to the values of their assets on the date of the payment, except that no inheritance, estate or succession taxes payable by reason of the Grantor's death, or debts or expenses or advances or reimbursements to the Grantor's Executors or Administrators for payment of such taxes, debts or expenses, shall be paid from or charged against the Marital Trust. The Trustees shall be fully protected in any action taken or omitted to be taken by said Executors or Administrators in contesting or failing to contest the legality, propriety, or amount of any such debt, expense or tax." (Art. XII, par. 13.) The trust agreement further states: "The Trustees shall at all times exercise the powers and discretions granted to them by this agreement, or by law, subject to their fiduciary duties, and all such discretions and powers shall be exercised in a reasonable manner." (Art. XII, last par.)

During Mr. Copley's lifetime, Helen Copley was neither an officer nor a director of the corporation, but after his death, she assumed the position of chairman of the board of directors and chief executive officer of the corporation. Upon taking control of Copley Press, Helen Copley quickly moved to restructure the board of directors, the executive committee of the board and the top management of the corporation. Her working relationship with Michael and Janice Copley deteriorated. Her ability in managing the corporate affairs was markedly high. The court's memorandum opinion states: "Events which had transpired in the operation of Copley Press in those nineteen months [following James Copley's death] should have made it obvious to the Trustees that the business had appreciated in value even beyond optimistic earlier projections. . . .

" . . . . . . . . . . . . . . .

"Trustees have performed admirably with regard to their management of Copley Press, Inc. Trustee Helen K. Copley has demonstrated

outstanding executive ability in placing Copley Press in a sound, profitable position today with a remarkable potential for future success." No contrary opinion is voiced in regard to Helen Copley's admirable management of Copley Press.

It should be noted, too, that the dividends paid to the nonmarital trust since Helen Copley took control have been sufficient to meet the obligations of the nonmarital trust to pay $100,000 annually to Jean Erdman and also to provide reasonable support for the children. No contest is made on this issue.

As administratrix, Helen Copley obtained the maximum extension for filing the federal estate tax return which was filed on January 6, 1975, and made the following declaration of tax liability:

| | |
|---|---|
| Gross estate | $33,733,380 |
| Funeral and administration expenses | (350,118) |
| Debts, mortgages and liens | (1,260,466) |
| Marital deduction | (15,942,498) |
| Charitable deduction | (11,000) |
| Exemption | (60,000) |
| Taxable estate | $16,109,298 |
| Federal estate tax before credits | 10,792,360 |
| State death tax credit | (2,053,888) |
| Net federal estate tax | $ 8,738,472 |

Helen Copley employed the appraisal firm of Marshall and Stevens to fix the value of the corporation. On the basis of this December 1974 appraisal, on the January 1975 estate tax return Helen Copley showed the 1,725,000 shares of Copley Press held in the *inter vivos* trust to be valued at $17.50 per share, or a total value of $30,187,500 and the 8,501.25 shares of preferred stock held by the trust were valued at $55 per share, with a total value of $467,569. The remainder of the gross estate consisted of assets received in the probate estate which totaled $3,078,311. Of the debts, mortgages and liens, the primary debt was that due Jean Erdman in the amount of $1,111,710.

In valuing these assets, neither Helen Copley nor her attorneys contacted potential buyers for their estimate of the corporation's worth. Under authority of the federal estate tax law (Int. Rev. Code, § 6166),

Helen Copley worked out an installment payment of the taxes in ten equal annual payments commencing nine months after death. The first two installments of federal estate tax attributable to the stock and all the estate taxes attributable to other assets were paid on July 7, 1975. This amounted to $2,735,889 including interest of $232,816. On the same date, the estate paid California inheritance taxes in the amount of $2,053,888. All of these taxes were calculated and paid on the basis of the $17.50 per share common stock valuation figure.

In order to raise this amount of money, certain assets of the nonmarital trust had to be liquidated since, under the terms of the trust agreement, the nonmarital trust was obligated to pay these debts.

Soon after James Copley's death, Helen Copley formed a conditional opinion the death taxes should be funded, if at all feasible, by a stock redemption plan so that the cash could be raised for payment of these debts without the sale of stock to outside persons. This would retain the control of the corporation within the family unhampered by outside influences. During the first weeks following James Copley's death, when Helen Copley and Thomas Ackerman served as co-trustees, they discussed the nature of a redemption and the tax implications of the various means of raising the necessary funds to pay the death taxes. James Copley had also discussed this matter with Ackerman before his death and had expressed a hope that these expenses could be met by redemption of the stock under the provisions of Internal Revenue Code section 303, permitting the income tax benefit for certain exchanges between a corporation and its shareholders of granting sale rather than dividend treatment where the exchanges are made in order to pay death taxes and deductible administration expenses. The board of directors of the corporation, Helen Copley then serving as chairman of the board, approved the redemption plan on October 30, 1974, subject to obtaining favorable revenue rulings from the Internal Revenue Service and consent from Wells Fargo Bank, the corporation's principal creditor. On May 9, 1975, the Internal Revenue Service issued a favorable ruling stating the proposed redemption satisfied the requirements of section 303 of the Internal Revenue Code. The trustees and the corporation then executed a redemption agreement for purchase by the corporation from the nonmarital trust of 672,133 shares of common stock for the stated value for estate tax purposes ($17.50). The sales agreement, however, provided the purchase price would be increased if the federal estate tax auditors increased the value of the stock.

Based on the value of $17.50 per share, the agreement provided for purchase of the 672,133 shares of stock for a total purchase price of $11,762,327.50 payable $200,004.91 in cash and by a 10-year, non-negotiable, subordinated installment note in the face amount equal to the difference between the purchase price and the cash down payment. The corporation covenanted not to cancel the shares or restore them to the status of authorized but unissued shares until the shares were released from a pledge agreement securing the corporation's performance under the redemption plan. Installments on the note were made to coincide with the payment schedules of the federal tax installment due dates.

The trustees argued vigorously with the Internal Revenue Service for adoption of the lowest possible figure. After extensive examination of the corporate assets by the Internal Revenue Service and conferences between the parties and their counsel, in October 1976, the Service assessed the value of the estate upward and on February 7, 1977, the Service and the estate executed an agreement as to final determination of tax liability. It was agreed the common stock of the corporation, as a block, had a fair market value at the date of death of $60,629,000 or $35.147246 per share. The corporation then issued to the nonmarital trust an adjusted promissory note reflecting the stock value of $35.147246 a share with principal and interest payments again geared to the revised installments owed by the nonmarital trust under the final determination of the federal estate tax liability. The number of shares redeemed in this revised transaction remained 672,133.

On April 4, 1978, the trustees caused the corporation to redeem an additional 102,474 shares of Copley stock. The shares were redeemed on a pro rata basis from the marital trust and the nonmarital trust as the respective holdings bear to the total outstanding shares. The value assigned to the shares was the revised value used for federal estate tax purposes. The second redemption resulted in 83,946 shares being redeemed from the marital trust and 18,528 shares being redeemed from the nonmarital trust. This redemption was functionally the equivalent of a dividend payable to each of the trusts but was treated as a tax exempt redemption under Internal Revenue Code section 303. In this regard, it was the contention of the objectors that if the nonmarital trust had received the proper value for its stock in the first redemption, it would have possessed a greater number of shares of the corporation at the time of the second redemption and, therefore, its pro rata share of the total proceeds of the second redemption would have been greater and the nonmarital trust would have received more cash.

When Helen Copley assumed control of the corporation, the other directors served more or less at her pleasure. Four attorneys designated as "trust assistants" serving the respective trusts personally or through their law firms were also either the personal attorneys of Helen Copley or employed as attorneys for the corporation. Three of the trust assistant attorneys were members of the board of directors of Copley Press throughout their time as such assistants.

After trial, the court found the value of the common stock at the date of the first redemption was undervalued and should have been fixed at $58 per share. It determined the nonmarital trust should be compensated for the differential. It held the trustees were willfully negligent in failing to know the $17.50 per share price was grossly below the realistic fair market value of the stock on May 21, 1975, the date of redemption. It determined that even the adjusted value of $35.147246 per share was inadequate, citing the following reasons:

"a. Unnecessarily and extremely high operating expenses of Copley Press which had been incurred for some time prior to the death of James S. Copley were detrimental to net profits of Copley Press. Any prospective buyer of Copley Press stock would have recognized the potential for eliminating and/or reducing many of these expenses.

"b. The Copley Press capital improvement program initiated by James S. Copley was about to bear fruit when the redemption decisions were made by Helen K. Copley. One time costs, such as new equipment and plant, severance for excess employees, plus an unusual newsprint shortage, adversely affected Copley Press profits in 1973 and 1974. It should have been obvious to the Trustees of the Non-Marital Trust and any prospective purchasers that these problems would be of short duration.

"c. During the 19-month period from the date of James S. Copley's death on October 6, 1973, to the date of the Copley Press stock purchase on May 21, 1975, there was an active and ongoing interest by buyers of newspaper properties.

"d. The market areas for the several Copley Press newspapers demonstrated to the Trustees of the Non-Marital Trust the great potential for future profits.

"31. Many other actual transactions involving the purchases and sales of newspaper properties illustrated the potential for realizing as much as 80 percent of the sales price being allocated to goodwill in the sale of a newspaper business. The Internal Revenue service settlement valuation of $35.147246 per share failed to consider the near unique market for newspaper properties in this country."

Because the stock was undervalued for purposes of the redemption, the nonmarital trust was obliged to sell 672,133 shares rather than 407,304. The result is the nonmarital trust retained only 190,367 shares rather than 455,196. This, of course, makes a substantial difference in the income it might expect to receive from dividends, as well as the relative holdings of each trust, hence the value of the remainder as a voting block. Using the $35.147246 price for redeemed stock, the interests of the marital and nonmarital trusts are 81.91918 percent and 18.08082 percent, respectively; using the court fixed value of $58 a share as the price for redeemed shares, the respective trust interests are 65.455 percent and 34.545 percent.

To adjust for this inequity, the trial court ordered the marital trust to transfer 173,346 shares to the nonmarital trust, thus increasing the total shares of the latter to 363,713 and reducing the shares of the marital trust to 689,154.[7] This brings the respective interests into proper proportion, i.e., 65.45515 percent and 34.54485 percent.

The court also found it was necessary for the marital trust to transfer the dividends it had received on those 173,346 shares between the date of redemption to the time of the trial court's decision, July 17, 1978. This sum was $364,488.20. In addition, the marital trust would have to pay all dividends on those shares received after July 17, 1978, until the 173,346 shares were delivered.

In order to correct the inequities occasioned by the second stock redemption on April 4, 1978, which was based on improper holdings, the

[7]The trial court might have ordered the corporation to reissue 264,829 shares which would have brought the respective interests to the proper level and not involved any transfers from the marital trust. This would be appropriate if the constructive trust theory is followed. The record does not disclose, however, why the court did not do so, but at the trial neither party raised any objection to the method adopted by the court to achieve equity. In fact at one point before trial, the trustees suggested this method of adjustment was within the trial court's power and "the most logical and simple remedy." The order of transfer of stock from the marital trust may draw a connotation it improperly acquired this stock. That inference should not be drawn. Nothing in the record supports it. The transfer is made in this way only to achieve equity.

court determined the corporation should have redeemed an additional 16,872 shares from the nonmarital trust (a part of the 173,346 found to be properly a nonmarital trust asset) and ordered that number of shares delivered to the marital trust from the nonmarital trust. The redemption price paid the marital trust for those 16,872 shares should be paid by it to the nonmarital trust. That sum is $593,004.34.

The dividends received by the nonmarital trust after July 17, 1978, until the 16,872 shares are delivered to the marital trust are also to be delivered to the marital trust.

All payments bear interest at the legal rate of 7 percent per annum until paid.

Additionally, the court made the following finding:

"As a result of the consummation of the Copley Press stock purchase, the Trustees:

"a. did not properly discharge their fiduciary duties and obligations to the beneficiaries of the Non-Marital Trust, did not reasonably exercise their discretions and powers under the Copley Trust, and breached and violated their Trustees' fiduciary obligations owed to the beneficiaries of the Non-Marital Trust and the Trustees' conduct thereby constituted a constructive fraud against the beneficiaries of the Non-Marital Trust;

"b. failed to act in the highest good faith toward the beneficiaries of the Non-Marital Trust;

"c. enabled Helen K. Copley to obtain an advantage over the beneficiaries of the Non-Marital Trust; and

"d. used and dealt with Non-Marital Trust property for the benefit of Helen K. Copley.

It also made this finding:

"In addition to the Trustees' actions in connection with the Copley Press stock purchase and their breaches of fiduciary duties, the hostility exhibited by the Trustees towards cross-complainants, the antagonism existing between the Trustees and cross-complainants, the Trustees'

concern for protection of their personal interests instead of actively determining and serving the needs of all of the beneficiaries of the Non-Marital Trust, the unwillingness of the Trustees to supply cross-complainants with information concerning the administration of the Non-Marital Trust except under court order and the inevitable conflict between the Trustees and cross-complainants which may result in the future, all make it essential for an independent fiduciary to be appointed to administer the Non-Marital Trust. Accordingly, Helen K. Copley and Joseph P. Kinney should forthwith be removed as Trustees of the Non-Marital Trust."

## The General Approach to Issues

As in so many types of cases, the touchstone to any court's resolution of this case is determining what was James Copley's intent as expressed in his May 1973 trust agreement. It is a duty of the courts to carry out that intent once determined. Rules pertaining to this subject were aptly summarized by the court in *Wells Fargo Bank* v. *Huse* (1976) 57 Cal. App.3d 927 [122 Cal.Rptr. 522], as follows (at p. 932): "[T]he paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be interpreted according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible [citations]. For interpretive purposes, there is no distinction between *inter vivos* and testamentary trusts. As the court put it in *Brock* v. *Hall* (1949) 33 Cal.2d 885, 889 . . . : 'the primary duty of the court in construing all documents is to give effect to the intention of the maker, and we can see no justification for any distinction in this regard between instruments operating *inter vivos* and those taking effect at death since the intention to be gathered from similar words or provisions, whether they be contained in a declaration of trust or a will, would ordinarily be the same.' (See also: *Estate of Russell, supra* [69 Cal.2d 200, 205]; *Vincent* v. *Security-First Nat. Bk.* (1945) 67 Cal. App.2d 602 . . . .)

"The centerpiece of interpretation, of course, is the langauge contained in the will or the trust document. One of the axioms is that words are to be taken in their ordinary and grammatical sense, unless a clear intention to the contrary can be ascertained (*Estate of Thompson* (1937) 18 Cal.App.2d 680, 684 . . . ). Where an instrument has been drawn by one skilled in the law, the presence of legal technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition (*Estate of*

*Thompson, supra* [64 P.2d 984]; *Maud* v. *Catherwood* (1945) 67 Cal. App.2d 636, 641 . . . ).”

What do we know James Copley intended by the trust instrument? Among other things, we know he intended:

1. Helen Copley, his wife, will be a co-trustee of the trust holding all the Copley shares at his death.

2. Helen Copley as co-trustee will be possessed of all but a few powers and all the protections conferred by the instrument on the trustees.

3. The co-trustees will have sole discretion as to whether to retain the Copley Press shares in the trusts.

4. Helen Copley will have the benefit of the dividend income generated by at least one-half of the Copley Press shares beginning at his death and continuing until the co-trustees, in their discretion, change the asset structure of the trusts or other events occur.

5. Helen Copley is also entitled to share in the income generated by the assets of the nonmarital trust.

6. Helen Copley’s interest in the income of the marital and nonmarital trusts will continue for her life.

7. Only the assets of the nonmarital trust will be used to pay the death taxes and most likely the expenses of administering his probate estate and his debts; the assets of the marital trust will not be touched for these purposes.

8. Janice Copley and Michael Copley, for their lives, will have the benefit of discretionary, then substantial, income derived from the assets of the nonmarital trust left after the death taxes, expenses of adminisntration and debts are paid.

9. David Copley will have the benefit of discretionary income from the nonmarital trust until Helen Copley dies, at which time he will begin to receive one-third of the nonmarital trust’s corpus if he is of designated age; and after Janice and Michael die, David (or his issue) will receive the remainder of that trust’s corpus.

Although they are not expressed in the instrument, certain facts bearing on James Copley's intent are important to remember while analyzing the issues of this case. Those facts include James Copley's having fully funded the trust before his death with the Copley Press shares through which he was able to and did control the corporation just as his father had controlled the same corporation. Also bearing on the issues we consider is the fact that within five months of his death, knowing he was terminally ill, James Copley placed his wife in a position as trustee with full power to vote the shares and from which she was empowered to exercise the same control of the corporation as he then had. That he contemplated retention of the corporation's shares in the trust is strongly shown by the trust's provision authorizing the trustees to recapitalize the stock of the corporation after Helen Copley's death in order to provide Janice and Michael Copley with substantial income on their respective shares of the then divided nonmarital trust.

## THE CONFLICT OF INTEREST

■ The trustees contend the trial court erred in finding a conflict of interest arose by Helen Copley's serving both as co-trustee and administratrix, and by entering into the redemption agreement establishing a price per share equal to the estate tax valuation.[8] Initially, it should be noted the trustor expressed a desire Helen Copley assume a role with conflicting interests. It is error for the court to use this as a basis for obviating the intent expressed in the trust. The role of administratrix would have obligations in this case comparable with those we see inherent in the role of trustee and principal officer of the corporation.

---

[8]The full finding reads: "Helen K. Copley placed herself in a position of irreconcilable conflict of interest by assuming the duties of Administratrix with the Will Annexed of the Copley Estate and by entering into the Copley Press stock purchase which established that the redemption price would equal the estate tax valuation. Helen K. Copley made it impossible to fulfill her fiduciary duties as Administratrix and as a Trustee of the Non-Marital Trust, since to successfully urge a lower estate tax value was to limit the price to be received for the assets of the Non-Marital Trust sold to Copley Press on May 21, 1975. Helen K. Copley, as Administratrix with the Will Annexed, urged a low estate tax valuation of Copley Press common stock for federal estate tax purposes. In light of prices paid for newspaper properties at or near the date of death of James C. Copley, the value of $17.50 per share of Copley Press common stock obtained from the appraisal firm of Marshall & Stevens was grossly below any realistic fair market value of the per share value of said stock at the date of death of James S. Copley on October 6, 1973 and at the date of the Copley Press stock purchase on May 21, 1975; for the purposes of negotiating the lowest possible estate tax determination, it was a valuable tool; however, for determining a fair redemption price of Copley Press stock held in the Non-Marital Trust, it was grossly unfair to the beneficiaries of the Non-Marital Trust."

The interest identified in the trial court's finding as the subject of the conflict, the price per share, is not truly descriptive of the interest vitally involved. The vital interest of prime importance to the estate and the trusts at the time of the redemption was the amount of the death taxes. Those taxes had the potential of diminishing substantially or even eliminating the nonmarital trust which bore the burden of paying the taxes on the entire estate. It was clear from the moment of James Copley's death that the value of his estate would result in application of the maximum 77 percent death tax rate. If the value of the stock is fixed too high, most if not all assets of the nonmarital trust would be consumed to raise the funds as a result of disposal of the only assets capable of making such large tax payments, i.e., the stock of the corporation. This realistically, at a minimum, could have impaired the ability of the nonmarital trust to make income payments to the beneficiaries, or put the effective control of the corporation in the hands of another and subjected it to less effective management, ultimately injuring the income and corpus beneficiaries of both trusts. A glance at the amount of death taxes based on the $17.50 per share figure, over $11 million ($30,187,500 common stock value), compared with the amount of such taxes based on the $35 plus per share figure, just under $23 million ($60,629,000 common stock value), demonstrates the potentially devastating multiplier effect attending valuation of the corporation. We are informed that if death taxes were figured on stock valued at $58 per share, the amount due would have been $38 million ($100,050,000 common stock value).

Any personal representative of an estate, personally responsible for payment of large sums of death taxes (see Int. Rev. Code, § 2002; and see Rev. & Tax. Code, § 14101), would share an identical interest of a trustee responsible by the terms of the trust for coming up with the money to pay those taxes from a particular trust the assets of which the trust must also preserve. That interest is to keep the amount of taxes as low as possible based on the applicable law and the factual circumstances then existing (see Estate Planning for the General Practitioner (Cont.Ed.Bar 1979) § 20.1, p. 725).

Here, at the time of the redemption, the administratrix and the trustees had the benefit of an appraisal creating a death tax liability which the nonmarital trust (really the corporation since the stock was the trust's only asset) could arrange to pay without suffering an undue burden. Yet, a tax value acceptable to the Internal Revenue Service had not been fixed at that time. It would have been folly to permit the reso-

lution of stock value in adversary proceedings between antagonists before that tax was determined. To open the door to such a public debate at that time undoubtedly would have piqued the interest of the Internal Revenue Service and resulted in that agency appraising the stock higher than it would otherwise.[9] We recognize there is no certainty of this result, but the practice of the agency leaves little doubt as to what its approach would be here and good counsel would caution the trustees on this strong likelihood. The amount of taxation and the ability to pay at the higher level could be an insurmountable burden.

In keeping this matter of valuation closely within the triad of the probate administration, trust management and corporate operation until the value was finally fixed for death tax purposes, Helen Copley as administratrix and as a co-trustee conducted herself with appropriate circumspection in working toward the goal, common to each role, of establishing the death taxes with finality in an amount as low as the law and the facts then applicable would permit. There was no conflict of interest in Helen Copley's assuming the duties of administratrix and working toward this goal by acting simultaneously as a trustee entering into the redemption agreement with the corporation. Had she done otherwise, and jeopardized the financial well-being of the corporation, trust and probate estate by urging or encouraging a higher valuation before the death taxes were fixed, her competency to act in either capacity could have been subject to serious question, and her potential liability most likely would have been far greater than it was in acting as she did (see, e.g., Annot. (1976) 68 A.L.R.3d 1265, Trustee's Overpayment of Estate Taxes; see also Annot. (1974) 55 A.L.R.3d 785, Executor-Liability for Tax Overpayment).

Similarly, the obligation to minimize the income tax effect by utilizing the Internal Revenue Code section 303 redemption agreement procedure was an obligation Helen Copley was required to observe. To

---

[9]By way of contrast to the figures of $35 plus per share ($60,629,000 total stock value) for October 6, 1973, the date of death value formally accepted by the Internal Revenue Service in February 1977, and $58 per share ($100,050,000 total stock value) for May 21, 1975, the redemption date value fixed by the trial court, Janice and Michael Copley presented expert appraisal testimony fixing a figure of just under $98 per share ($169,000,000 total stock value) for the October 6, 1973, value and just over $107 per share ($185,000,000 total stock value) for the May 21, 1975, value. Another appraiser of Janice and Michael Copley testified the May 1975 stock value was just over $106 per share ($183,000,000 total stock value). Both of these appraisers were working on the case before the formal settlement with the Internal Revenue Service. Common knowledge tells us what that agency would have done with the higher figures.

have attempted a sale to third persons would have had tax consequences necessarily avoided by the redemption.

The trial court erred in concluding an irreconcilable conflict of interest resulted from Helen Copley's assuming the position of administratrix with the will annexed and, as a trustee, by entering the redemption agreement establishing a price equal to the estate tax valuation.

### THE COURT-FIXED VALUE

■ There is error in the trial court's finding deeming the $17.50 per share price "grossly below any realistic fair market value of the per share value of said stock at the date of death of James S. Copley on October 6, 1973 and at the date of the Copley Press stock purchase on May 21, 1975 . . . ." The quoted portion of the finding recites as a preamble that this conclusion is drawn "[i]n light of prices paid for newspaper properties at or near the date of death of James S. Copley." The preamble alone does not permit drawing the conclusion the court made about the value of the Copley Press shares on May 21, 1975, 19 months after the date of death, for it refers only to prices paid for newspaper properties "at or near the date of death of James S. Copley." We cannot accept this finding as having bearing on the price per share on May 21, 1975, when the redemption agreement was executed.

Although we hold defective the trial court's finding the May 21, 1975, per share price was "grossly" low, we cannot overturn its finding $58 per share was the stock's value on that date as the trustees urge us to do. There was substantial evidence of a wide range of valuation figures from which it was reasonable for the trial court as trier of fact to infer $58 was the May 21, 1975, value. Accordingly, we deem this factual matter sufficiently established and supported by the findings we have quoted above at page 267. We have concluded, too, it is unnecessary to address what may be viewed as an indirect attack by the trustees on this stock value figure based on the trial court's failure to apply a discount figure to the valuation of the stocks redeemed because they represented minority shares. The figure established after the adversarial negotiation with the Internal Revenue Service applied no such discount, and we are not directed to appropriate points in the record showing this issue was preserved for appeal. A request for a finding of the "fair market value of a block of 672,133 shares of . . . common stock on May 21, 1975," does not sufficiently apprise the court of the nature of the request. Nor do we address the trustees' attacks based upon the trial

court's failure to make findings on stock valuations as of October 6, 1973, for such findings were not essential to resolution of the crucial issue, the fair value of the shares on May 21, 1975, when the redemption agreement was executed. We must accept the $58 per share figure found by the trial court as the fair market value of the common stock on May 21, 1975.

## THE OUTSIDE SALES

■ As we have implied in our discussion above, the trial court cannot be sustained in its finding the trustees abused their discretion by failing to consider the detriment to the nonmarital trust's beneficiaries through use of the Internal Revenue Code section 303 redemption at substantially less than the market value "and by failing to consider the possible benefit to the beneficiaries through the method of selling Copley Press common stock to 'outsiders' at the fair market value of such stock." While dealing with this difficult matter of valuation before the death tax valuation was fixed it would have been highly questionable in terms of preserving the trust estate by endeavoring to keep the death taxes low for the trustees to "let the shares out to bid," thus calling for a free market determination of value (see *Rubber Research, Inc.* v. *C. I. R.* (8th Cir. 1970) 422 F.2d 1402, 1406). Putting the shares out for bid or discussing such a sale when the buyers are not seriously locked into a purchase often provides a misleading evaluation and its real value is highly speculative. At this point, the trustees were still working on the premise an Internal Revenue Code section 303 redemption could be effected. Had competitors been offered an opportunity to help boost the valuation by making offers without obligation to buy (and very likely causing additional tax burdens), there is no way of telling how high the bidding might have gone. The taxing authorities would have had a field day and, should the value be fixed too high for death tax purposes, the death knell of the nonmarital trust and the corporation could well have been sounded as the consumptive 77 percent tax rate applied itself to the higher total valuation. In addition, had the trustees performed as urged by the objectors by selling all the nonmarital shares to third parties in order to obtain a better price, and had they obtained $58 or more per share, significant income taxes on the capital gain would have been incurred and the corporate well-being from both financial and control standpoints further jeopardized.[10]

---

[10]We are told by the trustees, for example, at a sales price of $58 and a tax basis of $35 plus, a capital gains tax of $4,002,448 would have been incurred in a sale. The sale

On the basis of either form of jeopardy, it was reasonable in this complex matter and fully within the trustees' broad power to reject consideration of outside sales.

The outside sale consideration properly played no role in the trustees' approach to death tax fixing and payment, and it should have been of no concern to the trial court in determining whether an abuse of discretion occurred. This finding of abuse thus must fail.

## THE USE OF INTERNAL REVENUE CODE SECTION 303 REDEMPTION

A necessary corollary of our conclusion of error in the finding of abuse of discretion in not considering "outsiders" in conjunction with the redemption is the conclusion there was no abuse of discretion in the trustees' using the Internal Revenue Code section 303 redemption to fund the nonmarital trust's death tax obligation. The finding in question expressly and correctly acknowledges the power to do so is reposed in the trustees subject only "to their fiduciary duties, and all such discretions and powers [must] be exercised in a reasonable manner."[11] Since we have eliminated the failure to go to "outsiders" as an element of impropriety, it is clear from the remainder of the finding, which is correct, the exercise of the power was no abuse of discretion by the trustees.

---

necessary to raise money to pay such a tax, accomplished at a $58 per share price, would result in an additional income tax and the sale of additional stock to pay it.

On the matter of corporate control which the trustees were clearly empowered to retain, a sale of all of the nonmarital trust's shares to obtain a better price would have given the purchaser an opportunity to obtain control of the corporation through acquisition of the voting preferred shares held by the charities and the retirement fund, or to stalemate the smooth functioning of the corporation through deadlocked voting or minority shareholder's lawsuits. The trustees reasonably could determine to avoid these possibilities.

[11]With our italics added, the finding in question reads in full: "Article XII of the Copley Trust grants broad powers and discretions to the Trustees in the administration of the Copley Trust, subject to the limitations hereinafter set forth in this Paragraph 35. *The powers set forth in the Copley Trust were sufficiently broad to permit (i) the use of an Internal Revenue Code Section 303 redemption for funding the estate tax obligation of the Non-Marital Trust, and therefore the Trustees were authorized to take part in a transaction concerning the Non-Marital Trust in which they had an interest adverse to that of the beneficiaries* without the prior consent of the beneficiaries. despite the absence of an express provision authorizing such transaction; and (ii) the sale of all or a portion of Copley Press common stock held in the Non-Marital Trust to persons or entities who had no interest at the time of such sale in Copley Press and who may be termed 'outsiders'. These powers and discretions granted the Trustees under Article XII of the Copley Trust were limited by the last paragraph of Article XII, and accordingly, in the exercise thereof, 'the Trustees [were] subject to their fiduciary du-

## The Statutory Fiduciary Duties

■ The trustees contend the trial court erred in concluding Civil Code sections 2228, 2229 and 2231 were violated by the trustees engaging in the redemption agreement.[12] The court's conclusion was, by engaging in the stock purchase the trustees failed to act in the highest good faith toward the beneficiaries (Civ. Code, § 2228), and Helen Copley as co-trustee used and dealt with the nonmarital trust property for her own profit (Civ. Code, § 2229) and she used the influence her position gave her to obtain an advantage over the beneficiaries of the nonmarital trust (Civ. Code, § 2231). We hold these conclusions cannot stand, for they ignore the plain meaning and operation of the trust as James Copley intended it to be carried out.

Quoting with approval from 2 Scott on Trusts, section 170.1, page 1321 (formerly p. 1213), the California Supreme Court in *Estate of Thompson* (1958) 50 Cal.2d 613 [328 P.2d 1], has said (at pp. 616-617): "'By the terms of the trust the trustee may be permitted to do what in the absence of such a provision in the trust instrument would be a violation of his duty of loyalty.' The cases in other jurisdictions involve for the most part real estate transactions wherein the trustee might make an individual profit by buying and selling property to and from the trust. The basic policy in those cases prohibits such transac-

---

ties, and all such discretions and powers [must] be exercised in a reasonable manner.' (Copley Trust, Art. XII, p. 28.) The Trustees unreasonably and arbitrarily abused their discretion by failing to consider the detriment to be caused to the beneficiaries of the Non-Marital Trust through the Trustees' method of utilizing the Internal Revenue Code Section 303 redemption in the Copley Press stock purchase by selling Copley Press common stock at substantially less than the fair market value of such stock and by failing to consider the possible benefit to the beneficiaries through the method of selling Copley Press common stock to 'outsiders' at the fair market value of such stock." (Italics added.)

[12]The Civil Code sections read:

§ 2228

*Trustee's obligation to good faith.* In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind."

§ 2229

*Trustee not to use property for his own profit.* A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner."

§ 2231

*Trustee's influence not to be used for his advantage.* A trustee may not use the influence which his position gives him to obtain any advantage from his beneficiary."

tions (Civ. Code, § 2229), but *this policy is deemed to have been overridden where in conflict with a specific direction in the governing instrument.* In the present case the same considerations are present in favor of compliance with the expressed wishes of the testatrix. By imposing her faith and trust in her designated executor and providing for his compensation, the purpose of *the policy which might otherwise restrict self-dealing transactions can no longer be accomplished and the policy is no longer a controlling consideration.*" (Italics added.)

These principles, drawn from trust law and applied to a will interpretation case, a fortiori apply to the trust interpretation problem at hand (see also *Wells Fargo Bank* v. *Huse, supra*, 57 Cal.App.3d 927, 932). The duty of loyalty imposed on a trustee (Civ. Code, § 2228) and the prohibitions against self-dealing by a trustee (Civ. Code, §§ 2229 and 2231) must give way to directions contained in the governing trust instrument.

Here, the trust directed payment of the death taxes and, as slightly conditioned, the expenses and debts involved in the probate administration were to be made from the nonmarital trust containing as its only asset, before any such payment, one-half the shares of Copley Press. Hence, after the prescribed payments are made in these circumstances the known certain result is the marital trust would have a greater percentage of the Copley Press shares than would the nonmarital trust, and the named trustee-beneficiary of the marital trust would thereby obtain a benefit by sharing in a larger percentage of the dividends and by holding a general power of appointment over this larger, more strongly controlling percentage of the corporation than was the case upon James Copley's death and until the payments are made. Ineluctably, the result was, as stated in the findings: ".... Helen K. Copley thereby consolidated her absolute control of Copley Press and rendered her personal position unassailable. Helen K. Copley also personally benefitted because such purchase had the effect of causing increased dividends to be paid to the Marital Trust, as described in Paragraph 41 hereof, and had the effect of causing increased redemption proceeds to be paid to the Marital Trust in the 'second redemption' ...." This inevitable result can and should be viewed, as well, as a direction contained in the trust instrument. The conclusion necessarily follows under the rules of the *Thompson* case, *supra*, 50 Cal.2d 613, 616 to 617, in carrying out this direction of the trust the trustees committed no breach of the duty of loyalty to the beneficiaries and no violation of the prohibition against self-dealing in the sense of profiting or obtaining an advantage. Nor, in

the context of the particular trust terms, the timing and tax payment circumstances involved in this case, can the trial court's findings and conclusions that the trustees breached their Civil Code section 2228 duty of highest good faith to the beneficiaries be sustained. By reason of the circumstances we have noted, the failure to realize the value was low and to make efforts to appraise the stock value as of May 21, 1975, must be viewed in proper context as not reflecting on the trustees' good faith "toward" the beneficiaries. Moreover, as we shall discuss in more detail in connection with the matter of the trustees' removal, the good reasons existing for not furnishing information at the times requested due to the unsettled taxation situation preclude the use of this factor as a basis for concluding the highest good faith standard was breached. Accordingly, the trial court's conclusions under Civil Code sections 2228, 2229 and 2231 are erroneous and must be disregarded.

## The Trustees' Redemption Date Valuation Efforts

In reaching this holding, we point out this intent and direction of the trust instrument can only be viewed as going to *the fact* there necessarily would be a relative increase and diminution in the percentages of the share holdings or values of the marital and nonmarital trusts, respectively, and to the attendant personal benefits and detriments connected with those relative value changes. It cannot be said the trust reveals an intent or makes a direction as to the amount or degree of any such relative value changes. Bearing on the latter issue are the trial court's findings the trustees were "wilfully negligent in failing to know that $17.50 per share was grossly below the realistic fair market value of Copley Press common stock on May 21, 1975," and: "29. Prior to the consummation of the Copley Press stock purchase on May 21, 1975, neither the Trustees nor any of their attorneys or advisors made any realistic, good faith effort to determine the fair market value of Copley Press stock as of May 21, 1975. Events which had transpired in the operation of Copley Press during the 19-month period after James S. Copley's death should have made it obvious to the Trustees that Copley Press had appreciated in value from its value on the date of James S. Copley's death, even beyond optimistic earlier projections. It was unfair to the beneficiaries of the Non-Marital Trust that the $17.50 per share date of death value of Copley Press common stock, as adjusted to $35.147246 per share, was utilized as the redemption price."

The factors recited by the trial court as bearing on the May 21, 1975, redemption date value, quoted above at page 267, also pertain to the

question of the proper relationship of marital trust benefit to nonmarital trust detriment as a result of correct share valuation as of the redemption date. Resolution of this question is primarily a factual matter and, as we have said, there is support in the record for the trial court's determination $58 was the fair market value of the shares on May 21, 1975. Determination of the correct relative benefit-detriment ratio follows as a matter of mathematical computation. If correct, as they are here, those computations bind us as a factual issue resolved on conflicting evidence by the trial court. Thus, we are bound by the trial court's factual finding there was no realistic good faith effort in connection with the May 21, 1975, fair market value of the shares.

■ However, on the finding of negligent failure to know the $17.50 value was low for purposes of the May 21, 1975, redemption agreement, it is only reasonable to gauge the trustees' duty to know fair market value by a standard taking the then existing circumstances into account. Given the unsettled death tax valuation and considering the trustees' broad powers as well as their specific tax-paying duties, we have concluded that as of May 21, 1975, the trustees owed no duty, running to the beneficiaries, to know the $17.50 per share value was grossly below the realistic fair market value of the stock on that date. This is not to say there was an absence of such a duty at some later date, particularly after the death tax evaluation had been resolved. Since the duty element of negligence is missing, the findings and conclusions on that subject fail.

In connection with the subject of the trustees' duty running toward the beneficiaries as of the date of the redemption agreement, we believe the trustees performed correctly in the interests of the nonmarital trust estate and all its beneficiaries by relying on the appraisal figure but permitting adjustment of the redemption price to reflect the valuation finally determined for death tax purposes. No more was called for at that time. We note further the trustees did nothing to jeopardize the beneficiaries' rights to question the valuation they fixed for purposes of the redemption or to diminish the security available to meet any transfers required in the event of a higher valuation. This proceeding amply demonstrates the ability of the beneficiaries to vindicate their rights in equity to question the trustees' performance, including their acts in connection with the redemption agreement and to recover the value pursuant to the higher valuation.

## The Remedy

■ The question left under these circumstances is one of remedy. We have concluded the result reached by the trial court as to the transfer of shares and cash is correct but not for all of the reasons given by the court. Alleged conflicts of interest in the trustees, breaches of the trustees' basic fiduciary duties and negligence do not furnish a basis for the remedy.

We have thus far held, in entering the redemption agreement:

(1) There was no conflict of interest in Helen Copley's acting as both administratrix and cotrustee;

(2) The trustees had no duty to look to "outsiders" for offers as evidence of value and they performed their functions for the best interest of the trust in not doing so before the death tax liabilities and payment methods were finalized in February 1977;

(3) There was no breach of the duty of loyalty to the beneficiaries and no violation of the prohibition against self-dealing, or obtaining an advantage over the beneficiaries, as embodied in Civil Code section 2228, 2229 or 2231; and

(4) There was no negligence in failing to know on May 21, 1975, the redemption date, valuation was below fair market value.

For none of these asserted reasons is there a remedy available to the beneficiaries. Nor is the constructive trust remedy available as a justification for the relief granted, for that remedy involves impressing the constructive trust on the original trust property or its product when it is in the hands of another (Civ. Code, § 2224; see 7 Witkin, Summary of Cal. Law (8th ed. 1974) Trusts, § 86, p. 5446; 3 Scott on Trusts, § 202, pp. 1658-1659; Rest.2d Trusts, § 202; Rest., Restitution, § 202). Since the remedy here imposed attaches not to the shares in the possession of the corporation where the original trust property is reposed but to shares in the marital trust, it is improperly labeled a constructive trust.

Nevertheless, it is a general principle that a court of equity will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests, and in connection with an accounting will give such relief, if any, as the beneficiaries may be entitled to receive

(Prob. Code, § 1138.2; 3 Scott on Trusts, §§ 199, 199.1, pp. 1638, 1639). Further, a trustee generally is duty-bound to exercise such care and diligence as a person of ordinary prudence would exercise (Civ. Code, § 2259; *Estate of Beach* (1975) 15 Cal.3d 623, 630-631 [125 Cal.Rptr. 570, 542 P.2d 994]; and see 3 Scott on Trusts, § 201, p. 1650; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Trusts, § 59, pp. 5420-5421).

The trial court's finding a value of the common shares as of the May 21, 1975, redemption agreement date was $58 per share permits the conclusion the remedy of specific reparation, though mislabeled a constructive trust, was appropriately applied here by the trial court (see 3 Scott on Trusts, § 199.3, p. 1639; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Trusts, § 85, p. 5445). As the trustees informed the trial court, this was a logical and simple approach to remedy. Because of the use of a redemption price of $35 plus per share as adjusted by the later determined death tax valuation settlement, a disproportionately large number of shares was redeemed from the nonmarital trust as compared to the number that would have been redeemed if the $58 fair market value had been used as the redemption price. This disproportionality resulted in an unfair, lower percentage (18.1 percent) interest in the corporation than the percentage (34.5+ percent) to which the nonmarital trust was equitably entitled. The unfairness and inequity of this result, determined by looking back after the death taxes are fixed to the redemption valuation figure from a perspective disconnected with the death tax situation,[13] permits the transfer ordered so as to make specific reparation. Thus, we uphold the trial court's award establishing a fair relative relationship between the two trusts' shareholding, and making the nonmarital trust whole.

## ABSOLUTE DISCRETION

In connection with the matter of the trustees' failure to determine the fair market value of the stock as of May 21, 1975, for trust

---

[13]We wish to emphasize, under the circumstances relating to taxation and especially considering the timing, the record demonstrates the trustees, as well as the administratrix with-the-will-annexed, acted in good faith and prudently in consummating the redemption and dealing with the tax authorities. They were guilty of no wrongdoing in those respects, obviously intending to effect a redemption of no more than the necessary number of shares to raise the funds for death taxes and administrative costs, and to do so at a correct value for tax purposes. They, of course, did not have the benefit of the trial court's determination upon highly conflicting evidence of the proper value of the stock for purposes of the trust beneficiaries' best interests and as of a time 19 months after the crucial date for tax purposes, the date of death.

284

beneficiaries' purposes, we cannot accept the conclusions which the trustees urge should flow from their argument the trustees' discretion under the trust instrument was "absolute" in terms of the power both to redeem and to value Copley Press stock. The argument the discretion is "absolute" is based on trust provisions empowering the trustees to exchange or transfer trust property "upon such terms as the Trustees, in their sole discretion, may deem advisable and for the best interest of such trust. . . ." (Trust Art. XII, par. 3); and stating that in making any division or distribution of property as provided in the instrument partly or wholly in kind or in money, "for such purpose or any other purpose requiring the valuation of any property held in any trust hereunder by the Trustees, except as otherwise provided herein, the valuation which the Trustees may place upon such property shall be binding and conclusive upon all interested persons." (Trust Art. XII, par. 13.)

While these discretions conferred by the instrument are indeed broad and could be viewed as "absolute," the latter terminology in legal contemplation does not mean unlimited or arbitrary (see Civ. Code, § 2269; *Estate of Miller* (1964) 230 Cal.App.2d 888, 908 [41 Cal.Rptr. 410]; and see *Estate of Ferrall* (1953) 41 Cal.2d 166, 173-174 [258 P.2d 1009]). It simply means the judgment of the trustees, exercised in good faith, shall control (*Estate of Gross* (1963) 216 Cal.App.2d 563, 567 [31 Cal.Rptr. 281]). The finding of fact with which we are bound is the trustees made no realistic, good faith effort to determine a fair market value on the stock as of May 21, 1975. This finding is equivalent to a determination there was no effort at all, and certainly not a good faith effort, in the matter of evaluating the stock's value as of May 21, 1975. Viewed this way, the trustees' action cannot be deemed an exercise of judgment in good faith to which the immunizing rule of the *Gross* case might apply (see *Estate of Miller, supra*, 230 Cal.App. 2d at pp. 910-912).

We find no fault with the trial court's straightforward finding the discretion of the trustees was not absolute but was limited by the last paragraph of article XII in the trust providing in the exercise of their discretions and powers the trustees are "subject to their fiduciary duties, and all such discretions and powers shall be exercised in a reasonable manner." This finding is supported by the trust's text and format, appearing as it does at the end of the trust's powers provisions and using the all-encompassing references to "the powers and discretions granted by this agreement" and to "all such discretions." In the matter of trustees' valuations, we note too the excepting clause for other provi-

sions in the trust, and we find it is reasonable to conclude the last paragraph of article XII tempers the power of the trustees to bind others by the valuations they fix. This view is consistent with Civil Code section 2269, reading: "A discretionary power conferred upon a trustee is presumed not to be left to his arbitrary discretion, but may be controlled by the proper Court if not reasonably exercised, unless an absolute discretion is clearly conferred by the declaration of trust."

In short, the trial court's interpretation the trustees' discretion is not absolute is a reasonable one with which we cannot disagree in the exercise of our independent authority to construe written instruments (see *Estate of Collins* (1977) 72 Cal.App.3d 663, 672, 673 [139 Cal.Rptr. 644]; and see *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 160]).

### CONSTRUCTIVE FRAUD

Further on the subject of our conclusion the trustees' lack of good faith effort to determine the value of the stock as of the May 21, 1975, redemption agreement date forms essentially the only basis for affording relief, in light of our earlier conclusions on the lack of other forms of fiduciary breaches, we have determined it was inappropriate for the trial court to have found and legally concluded the trustees' conduct constituted a constructive fraud.[14] The stated ground for relief does not amount to a violation of Civil Code section 2228, 2229 or 2231 in the factual context here, and is not enough to amount to constructive fraud (see Civ. Code, § 2234).

---

[14]On constructive fraud, the trial court's finding was:

"42. As a result of the consummation of the Copley Press stock purchase, the Trustees:

"a. did not properly discharge their fiduciary duties and obligations to the beneficiaries of the Non-Marital Trust, did not reasonably exercise their discretions and powers under the Copley Trust, and breached and violated their Trustees' fiduciary obligations owed to the beneficiaries of the Non-Marital Trust and the Trustees' conduct thereby constituted a constructive fraud against the beneficiaries of the Non-Marital Trust;"

The trial court drew the following conclusion:

"9. Cross-complainants are entitled to a judgment that by reason of the foregoing violations of Civil Code Sections 2229 and 2231 by Helen K. Copley and the consent, thereto by Joseph P. Kinney and the violation by the Trustees of Civil Code Section 2228, the Trustees, by engaging in the Copley Press stock purchase (as defined in Paragraph 25 of the Findings of Fact), committed a constructive fraud on the beneficiaries of the Non-Marital Trust pursuant to California Civil Code Section 2234. Cross-complainants are not entitled to a judgment for actual intentional fraud."

## The Removal of Trustees

We next consider the trustees' contention the trial court abused its discretion in removing them as the trustees chosen by the trustor. The trial court cited the following points as making it necessary to re-move Helen Copley and Joseph Kinney as trustees of the nonmarital trust:

(a) the trustees' actions in connection with the Copley Press stock purchase;

(b) their breaches of fiduciary duties;

(c) the hostility exhibited by the trustees toward cross-complainants;

(d) the antagonism existing between the trustees and cross-complainants;

(e) the trustees' concern for protection of their personal interests instead of actively determining and serving the needs of all of the beneficiaries of the nonmarital trust;

(f) the unwillingness of the trustees to supply cross-complainants with information concerning the administration of the nonmarital trust except under court order; and

(g) the inevitable conflict between trustees and cross-complainants which may result in the future.

Our preceding holdings have eliminated as bases for removal of the trustees the matters stated in paragraph (a), except to the extent the statement may encompass lack of good faith valuation effort in connection with the redemption agreement valuation, and paragraphs (b) and (e). Thus, in considering the propriety of the removal, we discuss only the possible exception coming within (a), the hostility, antagonism and future conflict referred to in (c), (d) and (g), and the unwillingness to furnish information referred to in (f). We approach this discussion having in mind the following statement of rules from a case with a similar fact situation: "When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimen-

tal to the trust. [Citations.] In *Estate of Brown* [22 Cal.App.2d 480 (71 P.2d 345)], the court said that the settlor's named trustee will be removed only for extreme grounds, such as incapacity, dishonesty, or lack of the qualifications necessary to administer the trust. (P. 486.) In *Estate of Keyston* [102 Cal.App.2d 223 (227 P.2d 17)], the court declined to remove the trustee, even though the entire corpus of the trust was closely-held stock in a corporation of which the trustee was shareholder and salaried president; the decedent trustor, said the court, was aware of this conflict, and no actual dishonesty was alleged. So here. No actual dishonesty or obvious abuse exists; the conflict consists of relationships known to the settlor and expressly sanctioned by her. The trial court acted correctly in refusing to remove the trustees." (*Estate of Gilliland* (1977) 73 Cal.App.3d 515, 528 [140 Cal.Rptr. 795].)

We point out too that "probably the most common reason" for a settlor to name a spouse who is also a primary beneficiary as co-trustee is to ensure the settlor's "intentions for that beneficiary are carried out." (Estate Planning for the General Practitioner (Cont.Ed.Bar 1979) § 5.21, p. 211, see also § 5.24, p. 214.) This reason obviously attaches to the provisions of James Copley's *inter vivos* trust as it was to operate after his death for the primary beneficiary of the whole trust, Helen Copley, and for the secondary beneficiaries during and after Helen's life. In light of the known factors we have set forth above at page 271 regarding James Copley's intent, the presence of this reason for Helen Copley's trusteeship in the case at bar makes need for an extreme showing of trustee misconduct before removal is called for. We have concluded sufficient basis for removal is not here present.

On the matter of lack of effort to determine the May 21, 1975, fair market value of the Copley Press stock, the remedy fashioned by the trial court in transferring shares and appropriate funds from the marital to the nonmarital trust makes whole the nonmarital trust. This remedy places the nonmarital trust in the relative stock ownership position it equitably should have had after the redemption was accomplished in compliance with James Copley's direction that trust pay the death taxes. The nonmarital trust having been made whole by this remedy, it follows this lack of effort does not furnish a basis for removing the trustees, and this is particularly true in light of the law's preference for the named trustees as described in *Gilliland, supra*, 73 Cal.App.3d 515 at page 528.

We observe, moreover, the situation presented here is somewhat analogous to a proceeding to confirm a sale during a probate administration where the court refuses to confirm the sale as petitioned because the price is too low and eventually sells to others at a higher price. Such a set of facts, without more, does not call for removal of the personal representative.

Hostility, antagonism and inevitable future conflict can justify an order of removal of the trustee when those factors impair the proper administration of the trust (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 632 [21 Cal.Rptr. 585, 371 P.2d 321]). There is here no direct finding or conclusion these friction elements impair the proper administration of the trust. Moreover, we must consider our earlier holdings with respect to the trustees' proper administration until the death taxes were fixed; the trial court's approval of the trustees' account and thus approval of their administration except to the extent of the redemption agreement, particularly its pricing aspect, and attorneys' fees for this litigation; and the high probability this friction or its likelihood was known to James Copley as evidenced by the provisions of the nonmarital trust differentiating between the interests of Janice Copley and Michael Copley on the one hand and David Copley on the other (see *Estate of Bixby* (1961) 55 Cal.2d 819, 824 [13 Cal.Rptr. 411, 362 P.2d 43]). It is also noteworthy the only persons involved in the friction between trustees and beneficiaries are the less favored Janice Copley and Michael Copley, whose income interests are in an amount left to the trustees' discretion until Helen Copley's death, and who are the children of a former marriage of James Copley. David Copley, the first-named remainderman of the nonmarital trust corpus as well as an income beneficiary in the same degree as Janice Copley and Michael Copley, and the natural child of Helen Copley, plays no part in the friction and raises no objection to the trust administration. Nor do any other of the immediate or contingent beneficiaries have involvement in this controversy insofar as friction is concerned. Finally, James Copley named and thus *intended* Helen Copley to act as a co-trustee for *both* trusts having as their assets the dominant, controlling shares of Copley Press. Accordingly, the trustees could keep those shares in the trusts and operate as James Copley did during his life, leaving the shares available to the more favored beneficiary, David Copley, when the trust obligations to Helen, Janice and Michael Copley, as well as Jean M. Erdmann, were fulfilled. (See *Estate of Bixby, supra,* 55 Cal.2d at pp. 824-826.) Under all of these circumstances, and taking into account certain commonalities of human nature, it can truly be said that in put-

ting together the trust instrument James Copley contemplated at least the potential of hostility, antagonism and conflict in the trust administration. Yet, he went forward with this particular plan which, though engendering friction, has not to date impaired the proper administration of the trust as he contemplated it would be carried out.

In light of these considerations and the *Gilliland* rule, we conclude it was error to remove Helen Copley and Joseph Kinney as trustees of the nonmarital trust on the basis of the cited friction elements.

Nor does the failure to inform the beneficiaries as they requested afford a ground for trustee removal.[15] As we have pointed out, there was good reason, and it was in the best interest of the trusts, to remain tight-lipped on matters relating to valuation until the death tax was settled. Thus, it was reasonable for the trustees to refuse to give the requested information and documents unless ordered by the court to do so. This is not an outright refusal. The law does not require the trustee of an *inter vivos* trust, as distinguished from a testamentary trust, to give accountings, but rather, authorizes the beneficiary or remainderman to petition the superior court for such information (Prob. Code,

---

[15]On informing the beneficiaries, the trial court found:

"37. The Trustees of the Non-Marital Trust had the fiduciary obligation to furnish the following information concerning the administration of the Non-Marital Trust to cross-complainants when requested to do so by cross-complainants:

"a. Financial statements of Copley Press;

"b. Copley Press Stock Purchase Agreement;

"c. Federal estate tax return filed by Copley Estate;

"d. All appraisals made of assets held in the Marital Trust and Non-Marital Trust;

"e. Income tax returns filed on behalf of the Non-Marital Trust;

"f. Revenue Ruling Request and Internal Revenue Service response regarding the Copley Press stock purchase;

"g. Minutes of meetings of directors, shareholders and executive committee of the board of directors of Copley Press; and

"h. Copley Press loan agreements.

"38. Notwithstanding cross-complainants' attorneys' repeated requests for the factual information and copies of documentation related to the Copley Press stock purchase which requests were made both before and after May 21, 1975, the Trustees declined to fully comply with such requests, and specifically declined to provide cross-complainants with the information referred to in subparagraphs a through h of Paragraph 37 hereof except under compulsion of Court orders.

"39. The Trustees of the Non-Marital Trust breached their fiduciary duties owed to cross-complainants by carrying out the Copley Press stock purchase in secret without regard to the interests of cross-complainants and by not supplying information concerning the Copley Press stock purchase to cross-complainants, both before and after May 21, 1975, when requested to do so by cross-complainants."

§ 1138.1, subd. (a)(5);[16] and see Drafting California Revocable Inter Vivos Trusts (Cont.Ed.Bar 1972) § 6.24, p. 197). At the same time, the law recognizes nondisclosure of the terms, assets, management, and administration of the trust may be in the trust's best interest, for Probate Code section 1138.5, subdivision (b),[17] permits the court to dismiss a Probate Code section 1138.1 petition on that particular ground.

Death tax aspects aside, time elements pertaining to the requests and refusals to furnish information are relevant to determining the propriety of the trustees' conduct. Actually the trustees remained silent as to trust matters only until April 1976, when they filed their complaint for declaratory relief to which they attached a complete accounting, ultimately approved with the noted exceptions for the stock valuation at redemption and the attorneys' fees for litigation (in fact, the petition under Prob. Code, § 1138.1, subject of our opinion in *Copley* v. *Copley, supra,* 80 Cal.App.3d 97, was filed in March 1976, and it too sought to settle accounts). This accounting covered the period from the date of death, October 6, 1973, through January 31, 1976. The trustees' account for the succeeding period of time through July 31, 1977, was approved as well. Although by March of 1976, the objectors began filing other proceedings in other courts which offered the possibility of court-ordered discovery of information they sought (see *Copley* v. *Copley, supra,* at pp. 101-102), they did not file the present cross-complaint until March of 1977, and there is no indication in the record before us they availed themselves of the specific relief compelling an account and report by the trustees as is permitted in Probate Code section 1138.1, subdivision (a)(5).

---

[16]Probate Code section 1138.1, subdivision (a)(5), reads: "(a) A trustee, beneficiary, or remainderman may petition the superior court for any of the following purposes:

". . . . . . . . . . . .

"(5) Compelling the trustee to submit his accounts and report his acts as trustee to a beneficiary or remainderman when it appears that the trustee has failed to submit an accounting and report within 60 days after written request of a beneficiary or remainderman and no accounting and report has been made within six months preceding such request."

[17]Probate Code section 1138.5 reads: "The court may dismiss a petition when it appears:

"(a) That the proceeding is not reasonably necessary for the protection of the interests of a trustee or for the protection of the interests of beneficiaries or remaindermen; or

"(b) That nondisclosure of the terms, assets, management, and administration of the trust is in the best interests of the objects of the trust."

Taken together these factors operate to excuse the trustees for the nonperformance of their general duty to the beneficiaries to give them upon their request complete and accurate information relative to the administration of the trust (see *Strauss* v. *Superior Court* (1950) 36 Cal.2d 396, 401 [224 P.2d 726]). Since the excuse applies, the failure to give information fails as a ground for removal of the trustees.

No ground for trustee removal can be upheld; neither have they violated nor are they unfit to execute the nonmarital trust (Civ. Code, § 2283). Therefore, we must reverse that portion of the decree with directions to confirm Helen Copley and Joseph Kinney as the trustees of the nonmarital trust.[18]

### THE FINDINGS ON INTENT

The trustees next complain of the lack of certain findings regarding James Copley's intent. Findings requested but denied by the trial court were that James Copley intended but did not mandate the trustees fund the obligations of the nonmarital trust through a redemption, if feasible, and avoid an outside sale, or, as an alternative, James Copley preferred a redemption. Although there was evidence supporting findings on the subject of intent, the evidence was somewhat limited by the trial court's application of the parol evidence rule of which rulings the trustees also complain.[19] More findings on the paramount matter of intent should have been made. However, in light of our interpretation of the trust instrument and the uncontroverted evidence of the circumstances surrounding its execution, as we have already set forth in this

---

[18]Having reached the conclusion the order removing the trustees was error, we need not consider the trustees' argument the trial court's appointment of the corporate successor trustee was contrary, first, to the law embodied in Civil Code section 2287 and Probate Code section 1138.9 which sections, generally, defer to the method prescribed in the trust instrument for appointing a successor, and, second, to the Copley trust's terms which, in article XI, calls for two individual successor trustees at all times after James Copley's death and sets forth a method for appointing successor trustees.

[19]Evidence of James Copley's verbal expressions of intent consisted essentially of the following statements to Attorney Ackerman in conversations about his estate plan:

1. In 1963, he mentioned his hope Copley Press would continue to be a family corporation.

2. In 1973, he expressed his feeling that to the extent practical, raising money for death taxes would best be done by a redemption under Internal Revenue Code section 303 of which he was aware because this was done in his father's estate.

3. Again in 1973, he said it was his very strong hope the trustees would be able to handle the matter of funding death taxes in a way that would keep the Copley Press shares in the trust and the family.

opinion, the absence of the findings constitutes no cause for the trustees now to be aggrieved. Moreover, as we read the trial court's findings, the gravamen of its decision is not that the trustees chose to use the redemption method in order to fund the nonmarital trust's obligations. Rather, the price used in the redemption is the fundamental concern. Noteworthy too is the fact the objectors concede the rectitude of the trial court's finding the trust authorized the trustees to redeem as well as to sell the Copley Press stock to outsiders. Accordingly, James Copley's intent or preference with respect to a redemption is not crucial to the ultimate determination of the case. It follows, the absence of such findings does not constitute a miscarriage of justice calling for reversal (Cal. Const., art. VI, § 13).

## THE OBJECTORS' ATTORNEYS' FEES

■ The trustees contend the trial court committed prejudicial error in refusing to make findings of the specific facts going to the amount of attorneys' fees for the objectors, including the amount of time reasonably spent by each attorney and the reasonable hourly compensation of each. After taking extensive and detailed testimony and evidence on the subjects of the time spent and value of attorneys' services, the court set the fees on the basis of its finding under the common fund doctrine the attorneys had created a fund in excess of $12 million benefiting all beneficiaries, and it made generalized findings covering such matters as the time involved, opposition, skill employed, risk involved and importance of the case.[20] The findings were signed and filed December 21, 1978.

---

[20]The generalized findings were:

"50. Among the factors considered in determining the amount of compensation to be paid Parker and Hervey for their services were the following:

"a. Time involved—Parker and Hervey have devoted many thousands of reasonable and necessary hours.

"b. Opposition—Parker and Hervey encountered vigorous opposition, particularly during the early months of these causes when discovery was like pulling wisdom teeth.

"c. Skill employed—cross-complainants' case was established largely through skillful cross-examination of the Trustees and the Trust Assistants. Great imagination and complete mastery of the subject matter were exhibited by Messrs. Hervey (of the Hervey firm) and Glassman (of the Parker firm).

"d. Risk involved—cross-complainants' counsel had little hope of a substantial fee unless cross-complainants were successful. Neither of cross-complainants could have personally paid a substantial fee to counsel in a losing cause.

"e. Importance—the importance of this case cannot be overestimated to cross-complainants. The sums involved establish the magnitude of the litigation.

"Hervey and Parker are entitled to receive, in addition to any sum previously received from other sources, the following sums as attorneys fees from the assets thus added to the Non-Marital Trust, $500,000 payable to Hervey and $400,000 payable to Parker."

In the May 1979 case of *Mandel v. Lackner* (1979) 92 Cal.App.3d 747 [155 Cal.Rptr. 269], on which the trustees rely, none of the evidence provided any basis for evaluating the attorneys' services on a per hour basis (see 92 Cal.App.3d 747, 752, fn. 2), and the findings did not state the time spent, the value of the services by either of the attorneys severally, or the value of their joint or several services on a per hour or other unit of time basis (92 Cal.App.3d 747, 754). Relying on *Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano III*), 48-49 [141 Cal.Rptr. 315, 569 P.2d 1303], which spelled out a formula for determining an attorneys' fees award by starting with a "base figure" calculated from time spent and reasonable hourly compensation of each attorney, the court of appeal in *Mandel* held it was an abuse of discretion for the trial court to establish the amount of fees from other than such a base figure (92 Cal.App.3d 747, 758-759). The court in *Mandel* also said findings of the time and unit-value factors are indispensable in cases where formal findings are mandatory (92 Cal.App.3d 747, 758, fn. 6).

Since, unlike *Mandel*, the record here contains evidence from which the base figure calculation can be made from the standpoints of both time and reasonable hourly compensation, and considering the recent firming up of the rule as set forth in *Serrano III* and *Mandel*, we conclude there was no error or abuse of discretion in the matter of fixing attorneys' fees for the objectors' attorneys. Moreover, contrary to the trustees' position, this case clearly falls within the confines of the common fund doctrine relating to attorneys' fees. The doctrine applies because notwithstanding the actual or potential resistance by some of the nonmarital trust's beneficiaries (Helen Copley and David Copley), as to that trust they nevertheless benefit from the recovery effected at the urging of the other beneficiaries (see *Serrano v. Priest, supra*, 20 Cal.3d 25, 35; and see *Hebbard v. Colgrave* (1972) 28 Cal.App.3d 1017, 1030 [105 Cal.Rptr. 172]).

On Janice and Michael Copley's claim of entitlement to attorneys' fees on appeal, we are of the view the $900,000 awarded their attorneys in large measure represented an augmentation to any reasonably calculated base figure by taking special account of the results they achieved. The trial court found, counsel "have created a fund totalling in excess of $12,000,000 for the benefit of all the beneficiaries of the Non-Marital Trust."[21] Mr. Hervey, for example, testified his firm had expended

---

[21]This figure may not take into consideration income tax consequences occasioned by the increased valuation and reduction by reason of added attorneys' fees and costs allowed here.

1,212.9 hours on the case and would expend an additional 150 to 200 hours before judgment. His hourly rate for the period in question ranged from $85 to $150 and it recently changed to a range of from $100 to $200. The billings he had made on the case to date were calculated at the $85 hourly rate. By rounding the hours spent to 1,410 and using the $85 per hour rate, we arrive at a total "base figure" amount of $119,850. The $500,000 fee actually awarded the Hervey firm thus includes an augmentation of over $380,000.

Though we do not know the actual base figure calculation made by the trial court, from calculations of this sort we can assume the trial court placed high premium on the amount recovered. In addition, it is fair to say, due to the certainty of an appeal in light of the particular judgment the trial court was making, the court realized the attorneys would be involved in appellate work. Due to the enormity of the augmentation and the uncertainties in the record as to the reason for it, we are compelled to conclude on this record Janice and Michael Copley's attorneys have been more than generously compensated for their efforts in the case and, considering the results of this appeal, no further compensation is called for (see *Estate of Miller* (1968) 259 Cal.App.2d 536, 549-550 [66 Cal.Rptr. 756]). However, in the event any of the attorneys for Janice and Michael Copley seek further compensation for their appellate work, we hold the entire issue of proper attorneys' fees, for both the trial and the appellate work, shall be reopened for a determination of record in accordance with *Mandel* v. *Lackner, supra*, 92 Cal.App.3d 747. The attorneys should make their positions known within 30 days of remittitur.

## The Trustees' Litigation Expenses

The trustees contend the trial court erred in disallowing charges made by them against the nonmarital trust for litigation expenses. Forming the basis of the trial court's disallowance of attorneys' and assistants' fees paid in connection with this litigation was its finding it "would be inequitable and unjust to charge the Non-Marital Trust with attorneys' fees and costs incurred as a result of improper performance of the Trustees' duties."

The trust instrument expressly grants to the trustees "the unrestricted right to . . . contest" any claim or charge against all or any part of the trust estate of either trust, "or any matter or question which may arise in carrying out the provisions of this trust agreement with respect to

any trust hereunder." Further, the trustees are granted "authority and power to employ such ... assistants, attorneys ... as in their opinion may be necessary or advisable in the proper administration or management of any trust hereunder, and to pay such ... assistants, attorneys ... reasonable compensation for their services. The Trustees are expressly authorized to retain as attorneys any law firm of which Thomas C. Ackerman, Jr. is a partner, and to pay to such law firm reasonable compensation for its services rendered to the trust. In addition to the foregoing costs, expenses, compensation and charges, the Trustees shall pay all other costs, expenses and charges incurred by them in the investment, management, operation, administration, collection or protection of the principal or income of any trust hereunder, as well as any and all taxes or other charges imposed upon such trust or any part or assets thereof or upon the Trustees of such trust.... provided, however, that this sentence shall not apply to the Marital Trust."

Thus, under the trust instrument, there is no question the nonmarital trust is required to bear the cost of legal expenses incurred for contesting claims against the trust estate by means of litigation. In view of our holdings the trustees violated no duties of a fiduciary at the times claimed, but rather, under general equitable principles, could be required to make adjustment for errors in undervaluation of the stock, the basis of the trial court's disallowance of litigation expenses no longer exists. The litigation undertaken by the trustees obviously was not in bad faith or without probable cause; in fact, the contrary was true. Accordingly, the trial court's denial of the litigation expenses cannot stand. The portion of the judgment disapproving the accounting credits from the nonmarital trust to the extent of $200,000 attorneys' fees incurred by reason of this litigation and requiring a reimbursement must be reversed. For the same reasons, the judgment's denial of attorneys' fees and costs and any compensation for the trust assistants in connection with this litigation is erroneous and must be reversed. In each instance, the trial court, on remand, shall determine the reasonableness of the amounts claimed.

### The Trustees' Compensation

Further, as to trustees' compensation which was not requested by the trustees or otherwise directly put in issue in this proceeding, the court's order denying the trustees any compensation for their services as co-trustees of the nonmarital trust for any period must be reversed, as in the case of litigation expenses, for lack of foundation in light of our

conclusions and for lack of elementary due process leading up to the order.

## THE PARTIES TO THIS PROCEEDING

It is contended David Copley and John Satterlee are indispensable parties. Code of Civil Procedure section 389 governs who are indispensable parties. It reads, in part: "(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

"(b) If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder."

This section, as adopted in 1971, limits compulsory joinder to those situations where the absence of a person may result in substantial prejudice to that person or to the parties already before the court. (See Cal. Law Revision Com. com. to 1971 amendment, Recommendations and Study Relating to Counterclaims and Cross-complaints, Joinder of Causes of Action and Related Provisions (Oct. 1970) 10 Cal. Law Revision Com. Rep. pp. 501, 515.) As revised, this section conforms substantially to rule 19 of the Federal Rules of Civil Procedure and the cases relating to the federal rule are relevant.

■ ■ The failure to join an "indispensable" party is not "a jurisdictional defect" in the fundamental sense; even in the absence of an "indispensable" party, the court still has the power to render a decision as to the parties before it which will stand (*Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 364 [140 Cal.Rptr. 744]). Indispensability is tested by looking to the status of the parties at the time relief is to be entered, or at the time the issue of indispensability is raised, rather than to their status at the time the suit is filed. It is for discretionary and equitable reasons, not for want of jurisdiction, that the court may decline to proceed without the absent party (see *Mayer v. Development Corporation of America* (D.Del. 1975) 396 F.Supp. 917, 922, fn. 2; cf. *Miracle Adhesives v. Peninsula Tile Assn.* (1958) 157 Cal.App.2d 591, 595 [321 P.2d 482]).

The court in *Serrano v. Priest* (1976) 18 Cal.3d 728 (*Serrano II*) at page 753 [135 Cal.Rptr. 345, 557 P.2d 929], said: "[I]n dealing with the doctrine of indispensable and necessary parties 'we should ... be careful to avoid converting a discretionary power or a rule of fairness in procedure [fn. omitted] into an arbitrary and burdensome requirement which may thwart rather than accomplish justice.' [Citations.]"

The equitable approach to David's and John's status leads us to but one conclusion, namely, they have not been injured or prejudiced in any way by the judgment especially as made final by this opinion. These beneficiaries have increased the value of the nonmarital trust's assets by some $12 million less the attorneys' fees and tax consequences. The entity required to deliver these assets to the nonmarital trust is the marital trust in which neither has an interest. A detriment they might be said to have suffered had the judgment been allowed to remain was the loss of the services of Helen Copley and Joseph P. Kinney as their trustees. The benefits that would flow from these trustees' efforts to preserve the Copley Press under singular ownership would conceivably have value. (Cf. *Estate of Gilmaker, supra,* 57 Cal.2d 627.) It should also be noted David and John were denied the opportunity to participate in the selection of new trustees. That is a detriment. Since we are reversing that portion of the judgment, they have suffered no loss or prejudice and hence cannot assert any basis for equitable relief at this point.

■ All beneficiaries of a trust are not indispensable parties to an action for an accounting (*Alison v. Goldtree* (1897) 117 Cal. 545 [49 P. 571]; but compare with *Estate of Reed* (1968) 259 Cal.App.2d 14 [66 Cal.Rptr. 193], where the relative interests of the beneficiaries were

contested). ■ Nor are all beneficiaries indispensable parties to an action against trustees for damage for breach of their fiduciary duty (see *Estate of Hensel* (1956) 144 Cal.App.2d 429, 437 [301 P.2d 105]; and see *Hebbard v. Colgrove, supra,* 28 Cal.App.3d 1017, 1030). The nature of such action is only one seeking damages from a third party and does not adversely affect their interests.

It must be concluded the failure to join David Copley and John Satterlee does not bar judgment in this case as they are not indispensable parties.

### THE MOTIONS TO VACATE AND TO DISQUALIFY

David Copley and John Satterlee contend there was error in denying their motions to vacate the judgment and to disqualify the judge.

■ Judgment was entered in the trust litigation on December 22, 1978. The trustees filed their notice of appeal on February 8, 1979. On March 14, 1979, David and John filed their motion to vacate the judgment pursuant to Code of Civil Procedure sections 473 and 663. At this time the court lacked jurisdiction to hear the matter because the perfecting of an appeal stays proceedings in the trial court upon the judgment appealed from (Code Civ. Proc., § 916). During the pendency of an appeal, the trial court is without power to hear a motion to vacate judgment from which an appeal has been taken (*Beresh v. Sovereign Life Ins. Co.* (1979) 92 Cal.App.3d 547, 552 [155 Cal.Rptr. 74] [Code Civ. Proc., § 473]; *Weisenberg v. Molina* (1976) 58 Cal.App.3d 478, 486 [129 Cal.Rptr. 813] [Code Civ. Proc., § 663]; see also 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 4, p. 4021). Clearly, the court here had authority only to deny the motion.

Considering further the motion to vacate the judgment under Code of Civil Procedure section 663, that statute requires the court to enter another and different order: "A judgment or decree, when based upon findings of fact made by the court, or the special verdict of a jury, may, upon motion of the party aggrieved, be set aside and vacated by the same court, and another and different judgment entered, for either of the following causes, materially affecting the substantial rights of such party and entitling him to a different judgment:

"1. Incorrect or erroneous conclusions of law not consistent with or not supported by the findings of fact; and in such case when the judg-

ment is set aside, the conclusions of law shall be amended and corrected.

"2. A judgment or decree not consistent with or not supported by the special verdict."

The motion to vacate the judgment together with a request to enter a new and different judgment must be denied where no new judgment is offered or where the findings of fact do not support the new judgment requested (*Estate of Kerr* (1954) 127 Cal.App.2d 521, 527-528 [274 P.2d 234]; *Mardesich* v. *C. J. Hendry Co.* (1942) 51 Cal.App.2d 567, 575-576 [125 P.2d 595]). David and John did not request a new and different judgment but only asked that the judgment be vacated. Moreover, the findings here are neither inconsistent with nor nonsupporting of the conclusions.

On August 8, 1979, after their motion to vacate was transferred from another judge to the trial judge's department for determination, David Copley filed an ex parte motion to disqualify the trial judge (Code Civ. Proc., § 170.6). The order denying a motion to disqualify a judge is not directly appealable but it may be reviewed on appeal from the judgment or other appealable order (*Estate of Cuneo* (1963) 214 Cal.App.2d 381, 384 [29 Cal.Rptr. 497]). In the case before us, this issue could be resolved in connection with the denial of the motion to vacate, but as we have already held, the superior court correctly ruled it had no jurisdiction to hear that matter.

Addressing the merits, however, the law is clear under Code of Civil Procedure section 170.6 the challenge must be timely made. It provides no such motion shall be entertained if it is made after swearing in the first witness or giving any evidence or after trial of the cause has otherwise been commenced (*Jacobs* v. *Superior Court* (1959) 53 Cal.2d 187, 190-191 [1 Cal.Rptr. 9, 347 P.2d 9]). The rationale for this rule is found in *Jacobs, supra,* at page 191: "If a disqualification were permitted under section 170.6 in matters which are continuations of a prior proceeding, it would mean that the judge who tried the case, and who is ordinarily in the best position to pass upon the questions involved, could by a mere general allegation of prejudice, and without any judicial determination of the facts, be disqualified from hearing such matters as motions for modification of a support order or an injunction, as well as motions for change of custody of children. Such procedure would make

it possible for litigants to gamble on obtaining a favorable decision from one judge, and then, if confronted with an adverse judgment, allow them to disqualify him without presenting facts showing prejudice, in the hope of securing a different ruling from another judge in supplementary proceedings involving substantially the same issues."

Here there had been not only evidence received, the case was fully tried when the motion was made. To substitute judges at this late stage in the nonjury trial would have necessitated a new trial and caused substantial hardship to the parties. The challenge of the trial judge was properly denied.

Finally, it should be noted David and John did not appeal the *judgment* in the main action but, rather, they noticed an appeal only from the August 10, 1979, minute order denying their motion to disqualify the judge, the minute order of August 22, 1979, finding the superior court was without jurisdiction to rule on the motion to vacate the judgment and the court's failure to grant the motion to vacate the judgment. While this would ordinarily limit the issues we would address in regard to their appeal, we may construe the appeal as being one from the judgment and proceed to the merits (see *Estate of Haveside* (1980) 102 Cal.App.3d 365, 368 [162 Cal.Rptr. 393]). We have already addressed, and discarded as baseless, the only remaining question, i.e., whether David and John were indispensable parties.

As a footnote to the appeal of David and John, we would conclude any claim they might have would be barred by laches.

The relief sought here involves the rights of a trust beneficiary and declaratory relief. As such, the court acts as a court of equity jurisdiction. We believe David and John are guilty of laches in any case, sitting as they did through depositions, trial of the case and entry of judgment without making any move to assert their rights. It is apparent they were very much aware of the litigation involving their interests. The effect of granting the motion to vacate the judgment under these circumstances would result in a severe injustice to the parties involved in the litigation who would be required to retry their case. We are provided no explanation of the reason for indifference to the issues and for not intervening, and we can find no excuse.

## THE ORDER

The cross-appeal is dismissed.

The judgment of the trial court is affirmed in all respects except:

1. The orders declaring the trustees violated their fiduciary duties, removing them as trustees of the nonmarital trust, restricting their actions, appointing a successor trustee in their stead and requiring transfer or delivery of assets and documents to the successor trustee, are reversed; Helen K. Copley and Joseph P. Kinney are confirmed as the trustees;

2. The order denying the trustees' fees in the performance of their duties as trustees is reversed;

3. The orders declaring a constructive trust arose are reversed but the stock and money transfers between the marital and nonmarital trusts as directed under equitable principles, are affirmed;

4. The order disapproving the accounting by disallowing credits from the nonmarital trust to the extent of $200,000 for attorneys' fees incurred by reason of this litigation, and requiring the marital trust to make a reimbursement, is reversed with directions to conduct further proceedings as to the reasonableness of such fees together with fees for this appeal, if any, and allow the same to become a charge upon the nonmarital trust;

5. The order denying compensation for trust assistants in connection with this litigation is reversed with directions to the trial court to conduct further proceedings as to the reasonableness of such expenses and allow the same to become a charge upon the nonmarital trust;

6. The order awarding attorneys' fees for the objectors is approved except that if any of them should request additional fees for this appeal within 30 days after remittitur, the trial court shall reconsider the entire matter of all such trial and appellate fees by way of further proceedings;

7. The July 31, 1979, orders of this court on supersedeas are dissolved and the Bank of America National Trust and Savings Association, the holder in escrow of stock owned by the nonmarital trust, is

ordered to deliver up the stock to the trustees with an accounting of dividends received, all to be effected within 60 days of the remittitur herein;

8. Costs of appeal incurred by Helen K. Copley, Joseph P. Kinney, Janice Copley and Michael Copley will be allowed as a charge upon the nonmarital trust; and

9. All further proceedings shall be in conformance with the views expressed in this opinion.

Brown (Gerald), P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied December 17, 1981.