Filed 10/26/23  Knight v. Simons CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SARA KNIGHT et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> DAVID BARRY SIMONS, <br><br> Defendant and Appellant, <br><br> ROBBI SIMONS, as successor trustee, <br><br> Real Party in Interest and Respondent. | D080663, consolidated with D080993 <br><br><br> (Super. Ct. No. 37-2019-00043983-PR-TR-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Higgs Fletcher & Mack LLP, John Morris, Roland H. Achtel, Scott Ingold, and Steven M. Brunolli for Defendant and Appellant.

Ross LLP, Peter W. Ross and Charles Avrith for Plaintiffs and Respondents.

Law Offices of Robin L. Cahill, Robin L. Cahill for Real Party in Interest and Respondent.

## I. INTRODUCTION

In this consolidated appeal[1] family members ask us to resolve a conflict about the correct interpretation of asset distribution instructions in a family trust (D080993). During their lifetimes, the trustors gifted into specific trusts for their two older grandchildren about two hundred thousand dollars each. By the time the trustors both died, those gifts had appreciated to over a million dollars apiece. Two other grandchildren, born much later, received substantially less money than their older cousins before the trustors died. The dispute in this case concerns how to value the monetary gifts received by all four grandchildren so they each receive "an equal share of the Trustors' estates." The trustors' son, Barry,[2] argues that his parents wanted all trust distributions assessed at their fair market value at the time of their death. The trustors' two older grandchildren maintain that regardless of the current fair market value of prior gifts, the trustors intended trust distributions to be given their value when received. The trial court concluded that based on the plain language of the amended trust, confirmed by extrinsic evidence, the older grandchildren's interpretation accurately reflects the intention of the trustors. We agree with the trial court.

---

[1]    Our case numbers D080663 and D080993.

[2]    David goes by Barry. To avoid confusion, we use first names because this dispute involves family members some of whom share a last name. No disrespect is intended. (See *In Re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475, fn. 1.)

Barry also appeals an order removing him as trustee and appointing his sister, Robbi, as successor trustee (D080663).[3]  The trial court removed Barry because a conflict of interest arose from his self-dealing, specifically, when he used trust money for personal loans.  The court found this "not good fiduciary behavior."  Also, he appeared hostile towards Sara and Renee in ways which undermined his ability to perform his trustee duties.  We also affirm that order.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties.

The trustors in this matter are Nathan Joseph Simons (Nathan) and Genevieve Emma Simons (Genevieve).  Appellant and defendant, Barry, is the trustors' son.  Barry's sons are two of the trustors' four grandchildren.  These grandchildren are much younger than their two cousins, who are the trustors' only other grandchildren.  Barry acted as trustee for his parents.

In addition to their son Barry, the trustors had a daughter, Real Party in Interest and Respondent, Robbi Simons (Robbi).  She is Barry's younger sister.  Plaintiffs and respondents, Sara Knight (Sara) and Renee Gaddis (Renee), are Robbi's children and the trustors' two older grandchildren.[4]

[3]  Robbi filed a notice in both appeals indicating she was not a party to the proceedings below and would not participate in either appeal.

[4]  Sara and Renee are between 15 and almost 25 years older than the younger grandchildren.

*B. Trust History.*

    *1. Original Trust.*

In 1984 Genevieve and Nathan (collectively the trustors) created the Simons Family Trust. In section 3.9.1 the trust provided that after the surviving trustor died the trustee would divide the trust residue equally among the trustors' children, Barry and Robbi:

> [T]he Trustee shall divide the Residual Trust into equal shares, one for each then living child of the Trustors, and one for each group composed of the then living issue of a deceased child of the Trustors.

It also provided that Genevieve and Nathan would, until their deaths, act as co-trustees with Barry, as the successor trustee. If Barry could not serve as trustee then Robbi would take that responsibility.

    *2. First Amendment.*

In 1993, when Sara turned 13 and Renee turned 3, Genevieve and Nathan amended their trust. They added the following paragraph to section 3.9.1, to account for the gifts given during the trustors' lifetimes to their then-existing grandchildren:

> Notwithstanding the foregoing, before the Trustee divides the Residual Trust into equal shares, the Trustee shall add to the fair market value of the Residual Trust an amount equal *to the then fair market value* of all gifts previously made by the Trustors to their grandchildren as evidenced by brokerage accounts then maintained for the benefit of any of the Trustors' then living grandchildren. The total of such accounts, when added to the Residual Trust, shall be the gross amount which is divided into equal shares as stated above; and there shall be deducted from such share

allocated to such child or the group consisting of his then living issue if such child is then deceased, *the present fair market value* of the total of all gifts described above which were made to that child's children during the Trustors' lifetimes. (Italics added.)

*3. Second Amendment.*

In May 2004, Genevieve and Nathan adopted a second amendment to their trust. By then Barry had one son, Charles Simons (Charles), who was two years old. Barry was expecting a second child, Walter Aiden Simons (Aiden), who would be born 5 months after this amendment. Relevant to the instant appeal, section 3.6.2[5] stated:

> [T]he Trustee shall distribute the balance of the trust among the Trustors' grandchildren (including any grandchildren born within nine (9) months of the surviving Trustor's death) in such a manner that to the extent possible, the assets distributed by the Trustors to each grandchild during the lifetime of each Trustor, when added to the funds to be distributed to each grandchild from this trust, will give each grandchild *an equal share* of the Trustors' estates. (Italics added.)

The second amendment maintained the trustors as co-trustees, with Barry as the successor trustee followed by Robbi. Sadly, Nathan passed away in 2006 and Genevieve in 2018.

*C. Trust Distributions.*

Between 1986 and 2005, the trustors gifted to Sara about $238,000 in stock and to Renee about $194,000 in stock. Nathan and Genevieve placed

---

[5] In 2004, along with this amendment, Nathan and Genevieve made additional changes to the trust, resulting in new paragraph numbers.

the gifts into two trusts, one created for Sara and another for Renee. Barry acted as trustee for both trusts.

From 2002 to 2012, the trustors gifted Charles and Aiden $25,250 each in cash, not securities[6]. Barry established one trust for both his sons into which the trustors placed their cash gifts to Charles and Aiden.

At the time of the second amendment in 2004, the gifts to Sara and Renee had appreciated to about $639,000 and $408,000 respectively. The grandparents' trust value remained at approximately $750,000.

When Genevieve died in 2018, the gifts to Sara and Renee were then worth roughly $1.8 million and $1.4 million, respectively. The gifts to Charles and Aiden were collectively worth roughly $50,000. The grandparents' trust remained at about $791,000, but is now worth around $1.2 million.

### D. Trial Court Proceedings.

#### 1. Petitions.

Barry became trustee after Genevieve's death in February 2018. On May 10, 2019, he sent a letter to Sara and Renee stating that the "equalization of [the trustors'] remaining estate is virtually impossible as [the trustors'] began investing and gifting stock when you were both still in diapers. It seems counterintuitive and unusual that [the trustors] would wish to penalize Charles and Aidan . . . by the simple fact that they were born later." Because of the "imbalance of gifting," Barry stated the remaining $771,494 in the grandparents' trust would be split between Charles and Aiden. He asked Sara and Renee to agree to that distribution.

---

[6] The record contains conflicting statements about these amounts. Barry claims in court filings that Charles received $24,000 and Aiden $20,000.

Three months later, Sara filed a petition in probate court seeking a trust accounting, an order for return of trust property, and suspension or removal of Barry as trustee. Referring to his May 10, 2019 letter, Sara claimed Barry committed a breach of trust and violated his duty of loyalty by asking her to waive her rights to receive any distribution without first providing an accounting. She also alleged that Barry took approximately $410,000 from the trust to pay for repairs and maintenance to his yacht.

Barry objected to Sara's petition and filed his own to confirm his proposed trust distribution. He argued the trust terms directed him to "equalize the gifting until all four grandchildren receive the same amount from [the trustors] based upon the fair market value of their respective brokerage accounts." However, Barry explained, given the trust assets only totaled $791,165.93 "there are insufficient funds to bring all of the grandchildren equal, the net effect is that Charles and Aiden should receive the entire Survivor's Trust residue." He also maintained that because Sara is not entitled to any distributions from the trust, she lacked standing to demand an accounting.

The probate court disagreed, ordering Barry to provide an accounting. Barry filed a petition for an order approving his February 26, 2018 through December 31, 2020 trust accounting. In this petition, he admitted borrowing funds from the trust but stated promissory notes at market interest rates secured any loans. Barry's accounting showed that from December 27, 2018, to March 8, 2019, he borrowed from the trust $410,000 for Bear Necessity, a company which holds his yacht.

Sara and Renee objected to Barry's petitions. They argued his equalization clause interpretation changed the phrase "the assets distributed by the Trustors to each grandchild during the lifetime of each Trustor" to "the

*present, fair market value* of the assets" distributed by the Trustors to each grandchild during the lifetime of each Trustor.  Indeed, the trustors omitted the term "fair market value" from the second amendment.  Additionally, the proposed distribution would unfairly benefit the younger grandchildren (the youngest, Aiden was 16 at the time) by making them as well off as the much older grandchildren (the oldest, Sara was 40 at the time), who had 30 years to invest and grow the fair market value of the gifts.  Instead, Sara and Renee advocated for a trust interpretation equalizing distribution values based on the dollar amount that each grandchild actually received from the trustors.

Regarding Barry's Bear Necessity loans, Sara and Renee alleged that no interest was paid on them.

### 2. *Trial on Barry's Petition to Confirm Distribution of the Trust Residue.*

In January 2022, the trial court conducted a bench trial on Barry's petition to confirm the distribution of the trust residue.

Barry testified that in 1980 he started working for Nathan in real estate.  Around that same time, he also started helping the trustors manage their finances, including writing and signing checks to pay their utilities and mortgage.  The trustors created their trust plan at Barry's recommendation after he learned about estate management concepts while getting his master's in business administration.  Genevieve and Nathan hired their own estate planning attorney, but Barry was "100 percent" involved with the actual creation of the original trust document.  He was also part of preparing the first amendment.  The trustors never made any changes to their estate plan without first discussing it with him.

Barry explained that discussions about the second amendment began in December 2003 because the trustors were concerned about being able to

8

provide for Barry's and Robbi's families fairly and equally. Barry had his first son in 2002 and his second in 2004, while one of Robbi's daughters was born in 1980 and the other in 1990. By 2003, investments the trustors made for Robbi's children had increased significantly in value. According to Barry, however, the trustors wanted all their grandchildren to "receive the same amount of value" and they expressed concern that Charles and Aiden would "never be able to catch up to Sara and Renee as far as what [the trustors] ended up giving [Charles and Aiden] in value." Instead of recounting any specific conversation between his parents and him during which the trustors expressed this intention, Barry claimed discussions about changing the trust occurred "daily."

Barry testified the trustors wanted to "equalize what Sara and Renee's stock and cash were worth" for Charles and Aiden. Leading up to the second amendment, Barry discussed with his parents how they might accomplish this. According to Barry, "the way [the trustors] figured is everything in their trust at that point would end up going to Charles and Aidan's trust because of how much Sara and Renee's trusts were worth at that point."

At trial, Barry explained that while he likely did not discuss with the trustors the equalization provision in the second amendment, they spoke about the subject many times. He also testified he never talked with them about "present fair market value" terminology being omitted from the second amendment.

Jennifer Goudeau, who worked for the Simons family and their business for 32 years, also testified. She said she talked to Nathan every day. She was close with Genevieve, remaining in regular contact with her after Nathan passed away. Beginning in 2002, she started having conversations with the trustors about how they wanted their trust distributed. She

9

testified Genevieve and Nathan worried they would never be able to provide for Charles and Aidan like they did for Sara and Renee. Nonetheless, they gifted additional stock to Renee and Sara in 2003, 2004, and 2005. According to Goudeau, the trustors expected that the balance of their estate would go to Charles and Aidan.

Robbi testified she never discussed with Nathan or Genevieve their trust, the disparity between gifts to her children and Barry's children, or any mechanism in their estate plan for equalizing gifts.

Sara likewise never had conversations with Nathan or Genevieve about equalizing their gifts to their grandchildren or what Nathan and Genevieve meant by "equal shares." She did not know that the trust existed until Genevieve died.

Renee testified she talked with Genevieve about how her grandmother wished the trust distributed. According to her, it was Genevieve's intention that the grandchildren would be given the same amount in the beginning. Going forward, the amount would be different based on what the beneficiaries did with their money. Renee testified that Nathan also wanted the grandchildren to receive the same amount. If a grandchild wanted to invest her or his money to earn more that would be up to him or her, but "to start off, he would not want any one of us having more than the other to begin with."

### 3. The Court Rules in Favor of Sara and Renee's Interpretation.

The court agreed with Sara and Renee's interpretation that the trustors intended the trust assets to go equally to their grandchildren, offset by prior gifts valued as of the date given. The court reasoned the plain language of the second amendment does not contain any reference to current

10

fair market value of past gifts. Instead, the court noted, the trust refers to the value of the " 'assets distributed . . . during the lifetime' " of the trustors. Notably, the fair market value concept was part of the first amendment and not incorporated into the second amendment.

The trial judge found that if the trustors intended for their grandchildren to hold assets of equal value at the time of the trustors' death, they could have funded separate trusts for Aiden and Charles. Or, alternatively, the trustors could have left the entirety of their trust to Barry's sons. Further, when Genevieve and Nathan executed the second amendment in 2004, they knew any money remaining in their trust could not bring Charles's and Aiden's estate gifts up to the value of Sara's and Renee's long-established trusts. The court found it unlikely that the Nathan and Genevieve executed a trust amendment obsolete from the outset.

The court also concluded that the testimony, which described what the trustors considered to be "equal" treatment of their grandchildren, provided little guidance. The great disparity in the grandchildren's ages granted the older grandchildren a longer period of time to benefit from their grandparents' gifts and investments. The younger grandchildren whether due to relative performance of the market, Nathan's declining interest or ability to invest, or both, simply, had less time to benefit. Under these circumstances the trial court stated that, " '[e]qual' division is more readily interpreted to mean that a gift of $100 to Sara in 2000 would result in a gift of $100 to Charles in 2018."

The court concluded Barry's testimony provided the only evidence that the trustors intended the distribution to depend on the current fair market value of the gifts. However, the court found Barry's testimony to be vague, unsupported by any other evidence, and ultimately not credible.

11

### 4. *The Court Removes Barry as Trustee.*

At the hearing following trial, the court questioned Barry's counsel regarding the trust accounting and specifically the $410,000[7] loaned to Bear Necessity. During trial, Barry testified that he owned Bear Necessity, which in turn owned his yacht. Counsel explained the loans paid for repairs to the yacht. The court contemplated suspending or removing Barry as trustee based on his self-dealing in taking approximately half the trust's money for his own purposes. It also noted that Barry showed bias and hostility toward Sara and Renee both in testifying that Sara impoverished the trustors, and in "snap[ping]" at Sara during his deposition. This referred to a time when Barry said something like "hey, a*****e Sara. You're a jerk." The court continued the matter to allow counsel to consult with Barry about potentially resigning.

At the review hearing regarding Barry's removal, his counsel informed the court that he was not willing to resign. Counsel acknowledged Barry took loans from the trust for personal use but asserted the family was aware of the loans and that the loans carried market rate interest. The court explained that using trust money for personal loans is a conflict of interest and not appropriate even if the family knew about it. The court removed Barry as trustee based both on his self-dealing and his apparent hostility towards two of the trust beneficiaries.

---

[7]     Bear Necessity took out five loans totaling $410,000.

# III.  DISCUSSION

*A.  The Trial Court Correctly Interpreted the Trust.*

In construing trust instruments the duty of the court is to first ascertain and give effect to the intent of the maker.  (*In re Estate of Gump* (1940) 16 Cal.2d 535, 548 (*Gump*).)  "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."  (Prob. Code, § 21102, subd. (a).)  "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained."  (Prob. Code, § 21122.)

The interpretation of a trust provision is subject to de novo review unless there is an ambiguity and conflicting extrinsic evidence as to the meaning of the ambiguous terms.  (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604.)  If the extrinsic evidence is in conflict, we use the substantial evidence standard as it applies to the trial court's factual findings.  (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266-1267 (*ASP Properties*) ["We review the agreement and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility.  [Citation.] If it does, we must accept any reasonable interpretation adopted by the trial court. . . ."].)  If the court decides the trust language aligns with the requested interpretation extrinsic evidence is admissible to interpret the trust agreement.  (*Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1132-1133.)

Here, trial testimony revealed a conflict in the extrinsic evidence.  Barry testified his parents intended that trust assets be distributed based on their fair market value when divided.  Renee said her grandparents wished that each grandchild receive equal gifts valued on the date of a gift's original

distribution.  Given the difference in the extrinsic evidence on this issue, we rely on the trial court's factual findings.  The court wrote, "[Barry's] testimony about conversations with the Trustors on the topic was vague, unsupported by any other evidence, and ultimately was not credible in any respect."  We accept the trial court's factual and credibility determination as part of our review.

Turning to our de novo analysis of the trustors' intentions based on the trial court's evidentiary findings, we conclude the only reasonable interpretation of the trust terms is prior gifts are assigned their value when received.  We start with the trust language.  It says the residue was to be divided equally between the grandchildren, offset by "the *assets distributed* by the Trustors to each grandchild during the lifetime of each Trustor." (Italics added.)  Barry contends the prior gifts should be valued by the fair market value at the time of Genevieve's death.  However, the trust language does not say that.  The trust instrument states that a beneficiary's allocation must be offset by the "assets distributed" during the trustors' lifetimes.  The "assets distributed" is plainly the amount gifted when the money left the trust.  (Prob. Code, § 21122 ["The words of an instrument are to be given their ordinary meaning unless the intention to use them in another sense is clear"].)  If prudent investing grew a gift's value, that does not change the amount the trustors originally gave a grandchild.  There is nothing in the trust that constitutes a clear expression of intent on the trustors' part that the "assets distributed" be given their appreciated value at a later date.  We cannot interpret trust terms in a manner to enforce a purported intent that is not ascertainable from the face of the trust.  (*Gump, supra,* 16 Cal.2d at p. 548 [the first step in construing a trust instrument is to ascertain the trustor's intent].)

14

Additionally, the trust states that the residue shall be distributed in a manner that gives "each grandchild an equal share *of the Trustors' estates*." (Italics added.) If a gift increased in value after it was given, that additional value was not a part of the trustors' estates. Therefore, equal division of the trustors' estates would not apply to an offset of prior gifts based on a calculation that includes increases resulting from growth occurring after the trustors transferred money out of the trust.

Barry argues that the trust is ambiguous and reasonably susceptible to his interpretation because it is silent on how to perform an equalization. We disagree. The trust states that "the assets distributed . . . during the lifetime of each Trustor, *when added* to the funds to be distributed" should to the extent possible "give each grandchild an equal share of the Trustors' estates." (Italics added.) This formula does not contemplate valuing the prior distributions based on current fair market value.

To the contrary, the trust's first amendment provided that equal distribution of the residue be offset by "an amount equal to the then fair market value of all gifts previously made by the Trustors to their grandchildren." Nathan and Genevieve omitted the "fair market value" language from the second amendment. This omission supports an interpretation that Nathan and Genevieve no longer wished their trust assets distributed using that earlier approach.

This interpretation is substantiated by the circumstances surrounding the second amendment. By the time Nathan and Genevieve made the second amendment, Sara's and Renee's trusts had grown to about $639,000 and $408,000 respectively. There was only approximately $750,000 in the grandparents' trust. The trustors knew they did not have enough in their own trust to give all grandchildren equal gift amounts if measured by the

assets' fair market value. We agree with the trial court that if Nathan and Genevieve wanted to equalize the fair market value as much as possible, they could have stated in the trust that its remainder would be distributed only to Charles and Aiden. Or they could have gifted Charles and Aiden more to invest during their lifetimes. They took neither action. Instead, the grandparents continued to give Sara and Renee gifts even after the second amendment. This evidence undermines Barry's interpretation.

As the trial court noted, the only evidence that the offset was to be based on the fair market value of the prior gifts was Barry's own testimony. However, extrinsic evidence may only be considered to ascertain a meaning to which the instrument's language is reasonably susceptible. (*Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949.) As discussed above, the language of the second amendment cannot be reasonably construed to use a fair market value of prior gifts. Even if this was a reasonably susceptible interpretation of the trust, the court found that Barry lacked credibility and we are bound by that credibility determination. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.)

Although Barry argues that Goudeau's testimony also supported his interpretation, we disagree. She did not provide any testimony alluding to a fair market valuation of the prior gifts. Rather, she testified the trustors expected that the balance of the trust would go to Charles and Aiden. It is true that this would be the result under Barry's interpretation. However, it also supports a view that the trustors expected that at the end of their lifetimes, there would be so little in their trust that its remainder would go to Charles and Aiden merely to account for the $238,000 in gifts they gave to Sara and the $194,000 they gave to Renee. Therefore, we conclude Goudeau's testimony does not necessarily support Barry's interpretation. (*ASP*

16

*Properties*, *supra*, 133 Cal.App.4th at pp. 1266-1267 [extrinsic evidence is reviewed de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility].)

We affirm the trial court's ruling that equal distribution of the trust residue means offsetting the prior gifts based on the value as of the date of the gift.

*B. The Trial Court Did Not Abuse Its Discretion in Removing Barry as Trustee.*

"The trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary." (Prob. Code, § 16004, subd. (a).) A trustee may be removed where the trustee has committed a breach of trust. (Prob. Code., § 15642, subd. (b)(1).) A trustee may also be removed where hostility between the beneficiary and the trustee threatens to impair the proper administration of the trust. (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 632.) However, a "settlor's named trustee will be removed only for extreme grounds, such as incapacity, dishonesty, or lack of qualifications necessary to administer the trust." (*Copley v. Copley* (1981) 126 Cal.App.3d 248, 287 (*Copley*).) "When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust." (*Id.* at pp. 286-287.)

The removal of a trustee is largely within the discretion of the trial court. (*Estate of Gilmaker*, *supra*, 57 Cal.2d at p. 633.) Here, the trial court removed Barry as trustee based both on his self-dealing and his hostility

17

towards Sara and Renee. We conclude the court properly indulged its discretion.

Barry contends there was no evidence of his self-dealing because during the trial the court excluded evidence of the loans he took from the trust. We disagree. Barry's own accounting showed $410,000 in loans to Bear Necessity, a company that he owns, and his petition to approve the accounting stated that he borrowed funds from the trust. When the court questioned Barry's counsel about the accounting, counsel confirmed that the loans paid for repairs to Barry's yacht. And the court allowed brief questioning regarding the loans during trial, at which time Goudeau testified Barry never repaid the loans, nor made any interest payments.

On appeal, Barry asserts for the first time that the loans were permissible under the trust and that "there are a multitude of conceivable scenarios" where the loans might make a good trust investment. At the review hearing regarding Barry's removal, however, his counsel merely acknowledged that Barry took loans from the trust for personal use, asserted the family was aware, and asserted the loan carried a market interest rate. The attorney did not argue that an evidentiary hearing would reveal facts showing the loans were somehow permissible self-dealing. Barry cannot raise an argument for the first time on appeal. (See *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 [an argument generally will not be considered if it is raised for the first time on appeal, because it would be unfair to the other party and the trial court].) On the record before us and the facts before the trial court, we conclude the court did not abuse its discretion in removing Barry as trustee for his self-dealing.

Regarding his removal based on hostility towards his nieces, Barry contends the trial court made no finding that his hostility impaired his

18

administration of the trust. "On appeal, we presume the court's ruling is correct. ' "All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown" ' by the appellant." (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at pp. 93-94.) Although it did not make an express finding, the trial court showed concern that Barry's interpretation of the trust, as well as his conduct during the trial, demonstrated hostility toward his nieces that threatened to impair proper trust administration.[8] The court did not abuse its discretion here. All that remained at the time of trial was for Barry to distribute the trust residue, now using a formula he opposed. Given the testimony and evidence it heard during trial we cannot conclude the court abused its discretion in removing Barry as trustee.

Finally, Barry argues the trustors anticipated conflict between their heirs, and even so, felt Barry would make the best trustee. We disagree that evidence supports the trustors contemplated the possibility that the conflicts at issue here would arise. The trustors wanted to treat their grandchildren fairly and equally; our review of the record reflected no showing that Genevieve and Nathan contemplated the potential for hostility or antagonism in interpreting what "equal" meant. Additionally, Barry's self-dealing in

---

[8]    Citing *Copley*, Barry contends an order removing a trustee based on hostility must be reversed when there is no "direct finding or conclusion" that hostility between the trustee and the beneficiaries impairs proper administration of a trust. We do not read *Copley* so broadly. Rather, the *Copley* court analyzed in detail the factors used by the trial court to relieve the trustees, even while noting the trial court made no direct finding or conclusion regarding hostility. The appellate court held that any antagonism between the trustees and certain beneficiaries had not yet impaired proper trust administration. We interpret that to mean reversal is not automatic. (*Copley*, *supra*, 126 Cal.App.3d at pp. 286-287.)

taking loans from the trust, particularly during the time when he was supposed to be working toward distributing the trust residue, constitutes conduct sufficient to justify the trial court exercising its discretion to remove him.

## IV.  DISPOSITION

The judgment regarding distribution of the trust residue is affirmed. The order removing Barry as trustee is affirmed.  Sara and Renee are entitled to costs on appeal.

RUBIN, J.

WE CONCUR:

BUCHANAN, Acting P. J.

CASTILLO, J.